[L. A. No. 27652.   In Bank.   Aug. 2, 1966.]

Estate of JOHN LARKIN, Deceased.  KUZMA VASILIE-VICH KOROLEV et al., Plaintiffs and Appellants, v. STATE OF CALIFORNIA, Defendant and Appellant.

[L. A. No. 27653.   In Bank.   Aug. 2, 1966.]

Estate of LIESE MARIE TERRY, Deceased.  KARLINA SIMSON et al., Plaintiffs and Respondents, v. STATE OF CALIFORNIA, Defendant and Appellant.

(Consolidated Cases.)

Slaff, Mosk & Rudman, Mosk & Rudman, Val Linton and Edward Mosk for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Elizabeth Miller and Ralph W. Scott, Deputy Attorneys General, for Defendant and Appellant.

TOBRINER, J.—The present cases, consolidated for appeal, require us to construe and apply section 259 of the Probate Code which restricts the freedom of Californians to leave their property to nonresident aliens. That statute makes the validity of such gifts conditional upon the existence of reciprocal rights, on the part of United States citizens, to share without discrimination in estates governed by the law of the foreign beneficiary's own country.

The beneficiaries in the present cases are citizens and residents of the Union of Soviet Socialist Republics (U.S.S.R.). In both cases the trial court received extensive evidence, both testimonial and documentary, concerning the written law and actual practice of the Soviet Union in matters of inheritance involving citizens of the United States. ▉ Without contradiction that evidence establishes that United States citizens share in Soviet estates upon the same terms and conditions as do Soviet citizens and that United States citizens have received, and from all present indications will continue to receive, economically significant interests in Soviet estates. Accordingly, we conclude that the requisite reciprocity has been established and that the wishes of the decedents may be honored.

The appellant in both of the present cases is the State of California, which seeks to escheat to itself the property of the decedents.[1] It relies upon Probate Code section 259.2, which provides for the escheat of gifts which fail for want of the reciprocity required by Probate Code section 259, if there are no other qualified takers.

▉ Section 259 conditions the validity of testamentary gifts to nonresident aliens upon the "existence of a reciprocal right upon the part of citizens of the United States to take . . . property upon the same terms and conditions as residents and citizens of the respective countries of which such

---

[1] The sum of the two estates is approximately $55,000.

64

aliens are residents. . . ."[2]  ██  By clear and unambiguous language the statute evidences a legislative determination to prevent the passage of California property to the residents of nations which discriminate against our citizens in matters of inheritance. Nothing in the language or history of the statute suggests that the Legislature, in restricting the freedom of our citizens to dispose of their property, sought to impose upon the whole world the system of property ownership and descent which prevails in California.

██  The reported decisions of our courts confirm the view that section 259 seeks equality of treatment for our citizens rather than identity of substantive law or governmental structure. (*Estate of Knutzen* (1948) 31 Cal.2d 573 [191 P.2d 747]; *Estate of Kennedy* (1951) 106 Cal.App.2d 621, 629 [235 P.2d 837]; *Estate of Reihs* (1951) 102 Cal.App.2d 260 [227 P.2d 564].)  ██  As the court noted in *Estate of Miller* (1951) 104 Cal.App.2d 1, 12 [230 P.2d 667], "[S]ection 259 does not require that foreign countries have the same judicial system as ours, nor even an independent judiciary. All that it requires is that there be no discrimination shown in inheritance matters as between the nationals of that country and the residents and citizens of our own."

Other authorities concur in this view of section 259. Thus the Oregon Supreme Court, in denying the claims of certain German heirs for want of the reciprocity required by the Oregon statute, carefully distinguished that statute from our own, noting that the two differ significantly in their language. The court concluded that the California statute "determines the reciprocal quality of rights by comparing the inheritance right of Americans with the inheritance rights of residents of the foreign country, whereas Oregon compares the rights of Americans to inherit in Germany with the rights of Germans to inherit in Oregon." (*In re Krachler's Estate* (1953) 199 Ore. 448 [263 P.2d 769, 776].) A commentator notes that, "The majority among the reciprocity statutes content themselves with securing equal treatment of their citizens abroad with the nationals of the respective countries. The reciprocity provision in the California Surrogate [*sic*] Code . . . is of this type." (Lenhoff, *Reciprocity in Function* (1953) 15 U.Pitt.L.Rev. 44, 53.) Similarly, California Estate Administration (Cont. Ed. Bar) page 708, declares: "Section 259 uses

---

[2]The statute contains two parts, identically worded, save that one refers to personal property and the other to realty. It thus requires separate determinations regarding the existence of reciprocity as to each type of property.

the words 'reciprocal right' to mean merely that United States residents and citizens have the same rights as residents and citizens of the alien's country to take from estates in that country. It does not require that equal rights be granted by the inheritance laws of the two countries." (See also Recommendation and Study Relating to the Right of Nonresident Aliens to Inherit (1959) 2 Cal. Law Revision Com. Rep. p. B-16.)

Though section 259 requires only the demonstration of a "reciprocal right" on the part of our citizens "to take property upon the same terms and conditions" as residents of the foreign country itself, we doubt that mere equality of treatment would suffice. We would almost certainly not find the requisite reciprocity with respect to a country which permitted no inheritance at all, or which made the enforcement of inheritance rights subject to official whim or caprice. Though the statute speaks in terms of equal treatment, we believe that it necessarily imports a requirement that the inheritance rights recognized in the foreign country meet some minimal standard of economic substantiality and that it be shown that such rights are regularly recognized in practice.

On the other hand, the fact that another country recognizes property interests of different scope and content than those which prevail in California, establishes its government on a different pattern than our own, or embraces a political philosophy rejected by our people, does not necessarily negate the existence of reciprocal inheritance rights. Section 259 does not confer upon our courts a broad charter to invalidate gifts made by our citizens to the residents of countries whose patterns of government, political philosophies, or domestic or foreign policies we dislike. We may require no more than a demonstration that the law of the foreign country, as written and as consistently applied in practice, enables our citizens to inherit *economically significant property interests* on terms of full equality with the residents of that country.

Section 1875 of the Code of Civil Procedure now provides that questions concerning the nature and content of foreign law constitute matters of law, as to which our courts should take judicial notice. In discharging their new responsibilities under the statute, the courts are empowered to "resort . . . to appropriate books or documents of reference" and to solicit "the advice of persons learned in the subject matter."

The records in the present cases contain voluminous

evidence bearing on the written law and actual practice of the Soviet Union in matters of inheritance involving citizens of the United States. The trial courts received the opinions of eminent authorities on Soviet law, both by direct testimony and by deposition, and had before them the testimony of a number of United States citizens who have received inheritances from the U.S.S.R. The records also contain many references to, and quotations from, scholarly works published in both the United States and the U.S.S.R. The evidence adduced affords no basis for doubting the determinations of the trial courts that the Soviet Union extends reciprocal inheritance rights to the citizens of our country.

The fundamental provision of Soviet law relating to the rights of aliens is Article 8 of the Enacting Law of the Civil Code of the R.S.F.S.R., and its counterparts in the other Union Republics.[3] Article 8 came into being in 1922 and continued to control the rights of aliens until the recodification of Soviet law in 1962. In relevant part Article 8 provides: ''The rights of citizens of foreign states with which the R.S.F.S.R. has entered into any agreement shall be regulated by these agreements. Insofar as the rights of foreigners are not provided for by agreements with the appropriate governments and by special laws, the rights of foreigners to free movement on the territory of the R.S.F.S.R., choice of profession, establishment and acquisition of property rights in buildings and land parcels, may be limited by decrees of the proper central organs of the government of the R.S.F.S.R. in agreement with the People's Commissariat of Foreign Affairs. . . .''

Although no term of Article 8 expressly undertakes to confer named rights upon aliens, respondents urge that Soviet jurists and legal scholars uniformly read the article as an affirmative grant of equal rights to aliens. As so construed the article recognizes the equal rights of aliens by making their rights subject to restriction exclusively in the four enumerated areas provided that no terms of treaty or statute prohibit such restriction. In support of this construction, respondents point to the consistently reiterated views of an imposing array of ''persons learned in the subject matter.''

One of the first to testify was Professor Harold Berman of

---

[3]The R.S.F.S.R. (Russian Soviet Federated Socialist Republic) is the largest of the 16 Union Republics which comprise the U.S.S.R.

On the uniformity of Article 8 throughout the U.S.S.R. see the companion case, *Estate of Yarovikoff*, *infra* at p. 886 [52 Cal.Rptr. 459, 416 P.2d 491].

the Harvard Law School and the Harvard Russian Research Center.[4] Professor Berman testified that the construction uniformly placed upon Article 8 by Soviet courts and commentators is that urged by the respondents. He accounted for the ambiguity of the language used in the article by explaining that the original draft had undertaken to specify the areas in which the rights of aliens could be established, but that it had later been amended so as to designate only those areas in which such rights could be restricted. Professor Berman further testified that he knew of no case which would cast doubt on the proposition that United States citizens enjoy full equality of inheritance rights in the U.S.S.R. and that he knew of many instances in which United States citizens have received sizeable interests from Soviet estates.[5]

The trial court also had benefit of the views of Professor John N. Hazard of the Columbia Law School and Columbia's Russian Institute. Professor Hazard has written at least ten books on Soviet law and dozens of articles which have appeared in every major law review.

In letters relating to the present case, Professor Hazard wrote: "[T]he law of the U.S.S.R. includes provisions stating that foreigners were to be treated equally with Soviet citizens in all matters regarding civil law unless special exceptions were established. Inheritance is, of course, within the civil law." Professor Hazard further noted that, "No special exceptions have been published in the U.S.S.R. limiting the rights of citizens of the U.S.A. to enjoyment of the rights of

[4]Professor Berman possesses the highest qualifications to testify in regard to the law of the Soviet Union. He first taught himself the Russian language while serving in the United States Army, commencing his work in Soviet law upon resumption of his studies at the Yale Law School. After teaching Soviet Law at Stanford Law School, Professor Berman received an appointment at the Harvard Law School where, since 1958, he has specialized in Soviet and International Law. As a director of the Russian Research Center, Professor Berman oversees studies of Soviet law and institutions.

Professor Berman has written many books and more than 40 articles on Soviet law which have appeared in the nation's leading law reviews. He has made several trips to the Soviet Union in the course of which he conversed with many Soviet jurists and legal scholars. He has represented the interests of American businessmen in the Soviet Union and has appeared in Soviet courts as an advocate. During the academic year of 1961-62, he lectured at Moscow University. Professor Berman stated that during his visits in the Soviet Union he had taken particular care to inform himself of the Soviet law and practice relating to inheritance by United States citizens because of the frequency with which he has been called upon to give an opinion on this matter in the United States.

[5]See also, Berman, *Soviet Heirs in American Courts* (1962) 62 Colum. L.Rev. 255.

foreigners to equal treatment with Soviet citizens in all matters regarding civil law. . . ." Accordingly, he declared: "I believe such equality with Soviet citizens to exist with regard to rights of inheritance. . . ."

The late Dr. Vladimir Gsovski of the Library of Congress expressed similar views. It was upon the testimony of Dr. Gsovski relating to the structure and political philosophy of the Soviet government that the court principally relied in *Estate of Gogabashvele* (1961) 195 Cal.App.2d 503 [16 Cal. Rptr. 77]. In *Gogabashvele* the court held that the written law and actual practice of the Soviet Union regarding inheritance by United States citizens could not establish the reciprocity required by our statute for the simple reason that a communist country cannot countenance "such [a] thing as a 'right' . . . as we understand it in this country."[6] (P. 528.)

We note, however, that Dr. Gsovski himself wrote: "The civil codes of the soviet republics do not contain any provisions dealing with the rights of aliens to acquire property by succession. However, it is generally accepted that aliens enjoy the right to inherit property in the Soviet Union from decedent aliens or from soviet nationals alike. This opinion is supported . . . by the general principle that aliens enjoy the same private rights as soviet nationals, unless otherwise provided by a special law, administrative order, or an international convention (Law enacting the Civil Code, Section 8)." (Gsovski, *Soviet Law of Inheritance* (1947) 45 Mich. L.Rev. 445, 449-450.)

The record also contains the testimony, received in open court, of two distinguished legal scholars from the Soviet Union. The first to testify, Professor Sergei Bratus, one of his nation's leading experts on civil law questions, has taught at most of its major law schools. He has written scores of books and articles dealing with the civil law and served as one of the principal draftsmen of the 1962 code.

Professor Bratus testified that the status which Soviet law confers upon aliens is that known in international law as a "national regime."[7] Accordingly, he testified, aliens enjoy full equality of rights with Soviet citizens, save that their rights may be expanded by treaty and, absent a contrary

---

[6]We consider the rationale of the *Gogabashvele* decision *infra* at p. 80 et seq.

[7]The concept of a "national regime" or "national treatment" is a familiar one in international law and connotes a situation in which a nation treats aliens on terms of equality with its own citizens.

The textbook International Law of the Academy of Sciences of the

treaty, may be restricted in the four areas listed in Article 8. Reviewing the areas in which decrees enacted pursuant to Article 8 had restricted the rights of aliens, Professor Bratus noted that no such declaration had in any way impaired the rights of aliens to inherit from Soviet estates.[8]

Professor Bratus further testified that Soviet scholars have never entertained the least doubt, nor Soviet courts raised any question, that Article 8 "recognizes that foreign citizens have the same property rights as Soviet citizens have, with those few exclusions which can be provided by law on the basis of Article 8. As to inheritance rights, the Soviet legislature never restricted foreign citizens in inheritance rights."[9]

The trial court also heard the testimony of Judge Alexander Volchkov. Judge Volchkov has taught international law at many Soviet law schools and has published extensively on this subject. A judge for many years, he represented his country on the Nuremberg tribunal. Since 1959 he has been President of Iniurcollegia (hereafter "I.C."), a voluntary association of Moscow lawyers who specialize in handling inheritance and property matters on behalf of aliens and nonresidents.[10]

Judge Volchkov testified that Soviet jurists and legal commentators agree that Article 8 vests aliens with equal rights of inheritance and that Soviet practice has always

U.S.S.R. Institute of State and Law declares: "With regard to civil rights, the Regime of aliens in the U.S.S.R. is in principle a National Regime—that is, in the field of Civil Law relationships, aliens enjoy the same rights as citizens of the U.S.S.R. and have the same responsibilities as Soviet citizens." (P. 163.)

An American commentator employs the term "national treatment" to characterize the type of reciprocity required by section 259 of our Probate Code. (Lenhoff, *Reciprocity in Function, supra*, 15 U.Pitt. L.Rev. 44, 53.)

[8]For the most part these laws relate to national security, such as those restricting the rights of aliens to accept certain types of employment in politically sensitive areas.

[9]Professor Bratus also quoted from his book, *The Subjects of the Civil Law* (Moscow, 1950) in which he wrote: "The main rule about the legal capacity of foreigners is contained in Section 8 of the Enacting Law, and it is shown in this section that . . . if the legal capacity of foreigners is not regulated by international agreement, or by laws, then the rights of foreigners to free movement on the territory of the Soviet Republics, and in respect of the choice of profession and industry, and for the acquisition of property rights in buildings may be limited by special decrees. Insofar as in Soviet legislation there is no special rule about the legal capacity of foreigners in general, or separate categories of foreigners, the general rules of civil law extend to them." (P. 75.)

[10]The name of the group is a contraction of "Association of International Lawyers." Judge Volchkov testified that I.C. enjoys no official status but is a specialized bar association whose members represent the interests of private parties for a fee.

conformed to this understanding. In support of this view, Judge Volchkov quoted from numerous Soviet texts and articles, including many of his own, in one of which he had written: "If a citizen of the U.S.A. is an heir at law, or by will, in the U.S.S.R. of property left by a citizen of the U.S.S.R., then irrespective of the fact that he resides in the U.S.A. or in the U.S.S.R. he takes this property on the same basis and on the same conditions as if he were a citizen of the Soviet Union." (Volchkov & Rubanov, *The Reciprocity Requirement in Soviet-American Inheritance Relations* (1960) Sovetskii Ezhegodnik Mezhdunarodnogo Prava [Soviet International Law Yearbook] 314; see also Volchkov & Rubanov, *The Property Rights of Soviet Citizens in the United States of America* (1961) Sovetskoe Gosudarstvo i Pravo [Soviet State & Law] 91.)

The record also contains the deposition testimony of Professor L. A. Lunts. Professor Lunts has been a teacher of international law in the Soviet Union since 1918. He is a senior member of the All Union Institute of Juridical Sciences and a member of the Editorial Board of the Soviet International Law Yearbook. He has served as consultant to I.C. and has published many texts and articles on international law.

In his affidavit Professor Lunts gave the following testimony: "Questions of civil capacity of foreign nationals have been until recently regulated in Soviet law by Article 8 of the Decree on the Enactment of the Civil Code of the R.S.F.S.R. . . . On the basis of . . . Article 8, civil rights of foreign nationals could be restricted—in certain aspects as set forth in Article 8—by decrees of central government organs, if these rights were not defined by international agreements or special laws. Enumerating all restrictions which might have been established in these cases, however, Article 8 makes no reference to limitations of inheritance rights of foreign nationals. As to the special laws mentioned in Article 8, none of them referred to questions of inheritance and, in particular, there was no law which suggested the possibility of establishing any restriction in the inheritance rights of foreign nationals. . . . If there is a foreign national among the heirs to an estate . . . he is called upon to inherit and takes part in the distribution of the estate on equal terms with heirs who are Soviet citizens. This thesis has never been doubted in theory nor in practice."[11]

---

[11]Professor Lunts accords extensive treatment to the inheritance rights of foreigners in his book International Private Law (Moscow 1949)

The list of jurists and legal scholars who have expressed the view that Article 8 vests aliens with inheritance rights equal to those enjoyed by Soviet citizens could be very considerably expanded. A few more are set out in the footnote.[12] For more complete listings see Berman, *Soviet Heirs in American Courts, supra*, 62 Colum.L.Rev. 257, 268, fn. 35; and Ginsburgs, *Inheritance by Foreigners Under Soviet Law* (1965) 51 Iowa L.Rev. 16, 25, fn. 17, 28, fn. 23.

In an effort to establish that this expression of opinion is not total, the Attorney General introduced the testimony of Dr. Armins Rusis, a researcher at the Library of Congress. Dr. Rusis testified that he did not believe that aliens enjoy inheritance rights in the Soviet Union but acknowledged that his view runs counter to the conclusion of the ''great majority'' of experts.

Dr. Rusis stated that he predicated his opinion on the fact that Soviet legal theory rejects the concept of ''inherent'' or ''implied'' rights, i.e., rights which have no foundation in

---

which is a textbook in Soviet law schools. In that volume he writes: ''The Soviet law places no restrictions whatsoever on the inheritance rights of foreign nationals. A foreign national enjoys, in principle, the same civil rights in our country, as does a Soviet citizen. In particular, he may be recognized as an heir on the same grounds as a Soviet citizen.'' (P. 316.) (See also Lunts, *Conflicts Questions in the Law of Inheritance* (1940) Sovetskoe Gosudarstvo i Pravo [Soviet State & Law] 140; Lunts, *Basic Conflicts Questions of Soviet Family and Inheritance Law* (1941) Academic Journal of the All Union Institute of Juridical Sciences, Series P., 155.

[12]Vilkov, *Questions of Civil Procedure in International Private Law,* Questions of International Private Law (Lunts, ed.) (Moscow 1956) 216-217: ''Citizens of foreign states enjoy in the Soviet Union the same rights of inheritance with respect to property situated in the U.S.S.R. as Soviet citizens. If an estate is opened in the U.S.S.R. and a person of foreign citizenship is among the heirs, then the latter may inherit and take part in the distribution of the estate on equal basis with the heirs who are Soviet citizens. In the U.S.S.R. there are no laws depriving foreign citizens including citizens of the U.S.A. of the possibility to receive estate property from the Soviet Union.''

Pereterskii & Krylov, International Private Law (Moscow 1940) 160-161: ''Citizens of the U.S.S.R. as well as foreign citizens can be heirs of foreign citizens (as well as heirs of Soviet citizens). The rule saying that foreigners have the right to receive estate property is inferred from Section 8 of the Enacting Law of the Civil Code of the R.S.F.S.R. according to the foreigners' general civil legal capacity in the absence of special limitations. The residence of the heirs also does not influence their inheritance rights, that is why estate property can be transferred to persons residing abroad.''

Boguslavsky & Rubanov, The Legal Status of Foreigners in the U.S.S.R. (Moscow 1959) 68: ''The National Regime of foreigners in the U.S.S.R. in the sphere of inheritance is expressed in the fact that foreigners here are fully equalized to Soviet citizens. There are no limitations or any kind of inheritance tax on foreigners in the U.S.S.R.''

statute, but which men enjoy by virtue of their human nature.[13] The relevance of this fact is open to question. No one has suggested that aliens would enjoy equality of inheritance rights with Soviet citizens in the absence of any statute relating to their rights. Rather, respondents have urged, and have adduced compelling evidence to prove, that Article 8, as uniformly read and applied in the Soviet Union, inferentially grants to aliens full equality of civil rights save for the specific exceptions which it expressly authorizes.

The Attorney General also invokes the names of the two Soviet commentators, Goikhbarg and Stalgevich, who were mentioned in the *Gogabashvele* decision. Examination of their views reveals that the Attorney General's reliance upon them is misplaced.[14]

---

[13]We note that rejection of the concept of ''inherent'' rights is common to all nations which derive their jurisprudence from civil law sources. See Schlesinger, Comparative Law (1959) 174-198.

[14]In *Gogabashvele*, the court stated that, ''Professor Goikhbarg, who was the principal author of the R.S.F.S.R. Civil Code, for a number of years after his authorship of the code, held the opinion that aliens had no right to inherit under Soviet laws'' citing 1 Gsovski, *Soviet Civil Law* (1948) 25. The cited source supports only that portion of the court's statement which relates to Goikhbarg's authorship of the code and says nothing about his views on any subject whatsoever. Moreover, the *Gogabashvele* court acknowledged that Goikhbarg's ''later'' writings were inconsistent with the view which it ascribed to him. (*Estate of Gogabashvele, supra*, 195 Cal.App.2d 503, 520.)

In the present case, the Attorney General calls attention to certain of Goikhbarg's views, apparently expressed in the course of an exchange with Professor I. S. Pereterskii which took place shortly after the enactment of the 1922 Code. Goikhbarg initiated the exchange by suggesting that the re-drafting of Article 8 had given rise to an apparent inconsistency between its two parts. He noted that the first part declares that the rights of citizens of countries with which the U.S.S.R. has treaties are to be governed by such treaties whereas the second part vests all other aliens with rights equal to those enjoyed by Soviet citizens. Thus, Goikhbarg noted, the anomalous situation might arise in which ''foreigners belonging to a country which did not enter into an agreement with our Republic occupy a better legal position than citizens of a country that has concluded agreements . . . with our government.'' (1 Goikhbarg, *Khozyaistvennoe Pravo R.S.F.S.R.* [Economic Law of the R.S.F.S.R.] (1923) 17.)

Professor Pereterskii replied that the inconsistency was only apparent and that the two parts of Article 8 should be read in conjunction with each other. He urged that the effect of the two was to provide that aliens enjoy equality of rights with Soviet citizens, but that their rights may be *expanded* by treaty. (Pereterskii, *Ocherki Mezhdunarodnogo Chastnogo Prava R.S.F.S.R.* [Notes on the International Private Law of the R.S.F.S.R.] (1924) 48.)

The context reveals that Goikhbarg did not believe that Article 8 confers no rights. Moreover, in 1928 he wrote: ''The general rule is being established in the Soviet Union, inferring from Section 8 of the Enacting Law of the Civil Code of the R.S.F.S.R. . . . according to which all for-

We conclude that the evidence fails to support the effort of the Attorney General to demonstrate any true disagreement among the experts, American and Soviet, on the meaning and significance of Article 8.

The experts also point to other Soviet statutes as tending to confirm the inheritance rights of aliens in the Soviet Union. A 1929 statute exempts the interests of aliens from the Soviet inheritance tax. Similarly, a decree of the Council of Ministers of the U.S.S.R. entered on April 21, 1955, provides: ''Estate proceeds which are due to foreigners are transmitted from the U.S.S.R. without hindrance, provided there is reciprocity with the appropriate foreign country.''[15]

---

eigners in the U.S.S.R. have equal rights with Soviet citizens.'' (Goikhbarg, International Law (Moscow 1928) 70.)

The other Soviet commentator mentioned in *Gogabashvele* was the legal philosopher, A. K. Stalgevich. In the present case, the Attorney General quotes a long passage from an article by Stalgevich which appeared in the prestigous journal Soviet State and Law. The passage in question is obscurely phrased and leaves doubt whether it was intended as an exposition or critique of current law. In the Attorney General's translation it reads: ''There are no reasons to call a citizen of the U.S.S.R. a 'physical person.' Frequently objections are made thereto, by stating that the concept 'Soviet citizen' is a narrow one, that it is necessary to take into consideration also foreigners, who are present in the U.S.S.R., that the concept of physical person applies. Firstly, however, it is necessary to take into consideration the provisions of the R.S.F.S.R. Civil Code and civil codes of other union republics according to which civil capacity is granted to Soviet citizens. Secondly, the question of the rights of foreigners is solved separately. In Section 8 of the Decree Enacting the R.S.F.S.R. Civil Code it is stated: 'The rights of citizens of foreign countries with which the R.S.F.S.R. has entered into any agreement are regulated by these agreements.' Consequently, the interpretation of the concept 'physical person' as applicable to both the U.S.S.R. citizens and to foreigners residing in the U.S.S.R., as a concept comprising both, contradicts the Soviet laws and introduces confusion into the precise and clear concepts of the science of Soviet Law.'' (Stalgevich, *Some Questions of the Theory of Socialist Legal Relationships* (1957) Sovetskoe Gosudarstvo i Pravo [Soviet State and Law] 23-32.)

Whether Stalgevich was criticizing or attempting to explicate Soviet law, we note that his views were almost immediately attacked in the very journal in which they had appeared by Cheburakhin, then president of I.C., whose article on inheritance included a section devoted to demonstrating the error of Stalgevich's statement. (Cheburakhin, *Praktika Preimeneniya Zakonodatelstva SSSR o Grazhdanskoi Pravosposobnosti Inostrantsev* (1957) Sovetskoe Gosudarstvo i Pravo [Soviet State and Law] 114, 115.) It is also significant that the journal editors took the occasion of Cheburakhin's article to express their categorical disagreement with Stalgevich.

[15]This reciprocity requirement is in the nature of a currency restriction and does not affect the vesting of interests. In determining the requisite reciprocity, the Soviet Union does not take account of differences between our states, but presently considers that the United States permits the transmittal of funds due Soviet citizens from American estates. (Berman, *Soviet Heirs in American Courts, supra,* 62 Colum.L.Rev. 257, 269, fn.; Volchkov & Rubanov, *The Reciprocity Requirement in Soviet-*

The Attorney General urges that the 1929 statute and the 1955 decree may not evidence the existence of rights conferred by Article 8 but may refer only to rights arising by treaty. An American commentator, however, points out that when the decree was issued the Soviet Union had "almost no" treaties on inheritance with foreign countries and he observes that if treaties are negotiated, they ordinarily resolve such questions as the transmittal of funds by their own terms. (Ginsburgs, *Inheritance by Foreigners Under Soviet Law, supra,* 51 Iowa L.Rev. 16, 68.)

Further confirmation of the fact that the Soviet Union recognizes the equal inheritance rights of aliens appears in the long-awaited recodification of Soviet law which became effective in 1962. Section 122 of the new Principles of Civil Law of the U.S.S.R. and Union Republics states: "Foreign citizens enjoy in the U.S.S.R. the same civil capacity as Soviet citizens. Special exceptions may be established by the laws of the U.S.S.R."[16]

The record demonstrates that section 122 of the new code represents no innovation in Soviet law. In his letters, Professor Hazard states: "In my opinion Art. 122 of the Fundamental Principles . . . was but a reenactment of a principle which existed prior thereto by virtue of Art. 8 of the law enacting the Civil Code of the R.S.F.S.R. of November 11, 1922, as interpreted by Soviet legal writers and the courts." Similarly, Professor Berman testified: "The new language made explicit what under Soviet law had always been held to be at least the implicit meaning of Section 8. It did not affect in substance those rights, but it purported to clarify them."

Professor Bratus, himself one of the principal draftsmen of the new code, stated: "Section 122 of the Fundamental Principles of the Civil Law fixes in more exact form that principle which existed from 1922." Similarly, Professor Lunts testified in his deposition that section 122 "reinforces the rules which have always and invariably been observed in Soviet practice."

Equally important with the law of the Soviet Union as written and as expounded by commentators is the actual prac-

---

*American Inheritance Relations, supra,* Sovetskii Ezhegodnik Mezhdunarodnogo Prava [Soviet International Law Yearbook] 308, 315.) Judge Volchkov testified that this practice had not been affected by the *Gogabashvele* decision.

[16]*Vedomosti Verkhovnogo Soveta S.S.S.R.* [Journal of the U.S.S.R. Supreme Soviet] No. 525 (1961).

Article 59 of the new code declares that "Foreign citizens have access to Soviet courts and enjoy equal procedural rights with Soviet citizens."

tice of that country in matters of inheritance involving American citizens. Indeed, the decisions of our courts reflect the view that the requisite reciprocity does not exist when a nation purports to confer equal rights in its written law but effectively denies them in practice. (*Estate of Schluttig* (1950) 36 Cal.2d 416, 423 [224 P.2d 695] ; *Estate of Miller, supra,* 104 Cal.App.2d 1, 4.)

Moreover, our courts have found proof of the actual practice of foreign states sufficient to establish reciprocity despite the fact that no provision of foreign written law specifically confers such right. In *Estate of Miller, supra,* the court upheld a finding of reciprocity with Nazi Germany, predicating its conclusion on the testimony of experts and evidence of the actual practice of the Nazi regime, although the court noted that, ''Neither Americans nor aliens generally are mentioned in the German Civil Code. . . .'' (P. 5.) (See also, *Estate of Reihs, supra,* 102 Cal.App.2d 260; *In re Nielsen's Estate* (1945) 118 Mont. 304 [165 P.2d 792].) [17]

The record in the present case supplies extensive evidence of Soviet practice in matters of inheritance involving alien beneficiaries. Most of the expert opinions above set forth have referred to Soviet practice as confirming the experts' understanding of Soviet written law.

Nor does the record want for mention of specific instances in which United States citizens have received inheritances from Soviet estates. Judge Volchkov testified that he had himself handled many cases on behalf of American heirs and had with him in court a list of twenty cases, although he was not permitted to testify regarding their details. (See also Berman, *Soviet Heirs in American Courts, supra,* 62 Colum.L.Rev. 256, 269, fn. 36; Ginsburgs, *Inheritance by Foreigners under Soviet Law, supra,* 51 Iowa L.Rev. 16, 32, 48-50, 52.) [18]

[17]In the latter case, the Montana Supreme Court found that evidence of the actual practice of the Danish government established the existence of the reciprocity required by the Montana statute. The court reached this conclusion despite the fact that a representative of the Danish government had acknowledged that, '' [T]here was no written statute nor decision of a court of that nation which expressly 'either permitted or prohibited the transfer to heirs, devisees and/or legatees residing in the United States of property left by deceased persons in Denmark.' '' (P. 308.)

[18]The authors of a recent article undertake to ''distinguish'' certain cases of inheritance by United States citizens which appear in three Soviet sources. They contend that the precedential value of these cases is ''questionable'' because they ''do not involve decedents of central Russia itself, but rather citizens of territories annexed to the Soviet Union during the course of World War II who leave property to relatives who escaped to the West.'' (Bader, et al., *Soviet Inheritance Cases*

The trial courts also received the testimony, chiefly by deposition, of several of the United States citizens who have received inheritances from Soviet estates. Mrs. Olga Kondratow testified that she first contacted the Soviet Embassy on learning of the death of her brother, a Soviet citizen. The embassy referred her to I.C. which requested that she execute a power of attorney in their favor and forward certain documents relating to her identity. Acting on Mrs. Kondratow's behalf, I.C. secured an accounting of the estate and forwarded to her the sum of $8,600 representing her share of the proceeds.

Mrs. Allisa Warnke testified that she contacted I.C. after the death of her mother in the Soviet Union in 1960. I.C. determined that Mrs. Warnke's mother had left deposits in Soviet banks in two cities. After payment of a 10 percent fee and allowance for a small gift which Mrs. Warnke wished to make to a friend in the U.S.S.R., Mrs. Warnke received the sum of $4,830.83 as her share of the estate.

Serge Novin testified that he secured a six-page inventory of the estate of his sister in the Soviet Union from I.C. and directed that the property be sold with the exception of a certain gold bracelet, later delivered to him by an official of the Soviet Embassy. He received half of the proceeds of the sale (less a 10 percent fee), having directed that the other half go to a neighbor who had cared for his sister.

A number of the deponents also testified to the receipt of realty located in the Soviet Union. Mrs. Vera Kalnins testified that her mother died in the U.S.S.R. leaving a six-room house. Mrs. Kalnins and her brother, a Soviet citizen, each received a half-interest in the estate. Through I.C., Mrs. Kalnins negotiated and consummated the purchase of her brother's interest. She now holds the deed to the house and has been advised by I.C. that the house will bring $24,000 which she can have remitted to her in United States currency. She testified, however, that she does not wish to sell the house, but instead rents it out, arranging for the rental fees to be used for

---

*in American Courts and the Soviet Property Regime,* 1966 Duke L.J. 98, 107-108.)

Apparently the authors are unfamiliar with the majority of the cases to which we refer in this opinion, many of which involve residents of "central Russia." Moreover, the authors nowhere explain why the Soviet Union should be particularly deferential to the testamentary directions of persons resident in "annexed territories" or uniquely solicitous of the interests of beneficiaries who "escaped to the West." A contrary hypothesis would be more plausible.

certain repairs and improvements. She intends to sell the house when the exchange rate improves.

Similarly, Arseny Tenison testified that his sister in the Soviet Union died leaving a house and some personal property. He retained I.C. to represent his interests and paid them $211. He testified that certain of his sister's personal property was sold at his direction, but that he now holds title to the house and has given a power of attorney to his niece in the Soviet Union to collect the rents and supervise the upkeep of the house. I.C. has advised that he can sell the house and receive the proceeds, but he states that he wishes to keep the house in the family.

Roman Makarewicz testified that he too had received an interest in real property located in the Soviet Union but had elected to take his interest in cash. He realized $5,480.73 as his share of the realty and directed that his share of the estate's personal property should be sent to Poland for the support of his sister.

The Attorney General called only one witness, Alexander H. Grant, who testified that his mother died in the Soviet Union in 1960 leaving five acres of land with two buildings containing a total of five apartments and a summer house. Grant testified that his mother had occupied one of the apartments and had lived on the rental income produced by the others. Her will directed that Grant should receive half of her property and the rest should go to Grant's brother and son, citizens of the U.S.S.R. The United States State Department referred Grant to I.C. which forwarded an inventory of his mother's estate which tallied with that supplied him by his mother-in-law, a Soviet citizen.

Grant further testified that his relations with his brother were hostile and that his brother had sold his own half of the realty and moved his family into Grant's half. Grant had received an offer for his share but the purchaser would not buy so long as Grant's brother remained in occupancy. Grant testified that I.C. has repeatedly written to him asking whether he intends to evict his brother. He stated that he had received a letter from them ''about four months'' before the taking of his deposition in which they indicated ''that they would like to know finally what I have decided. . . .'' Grant indicated that his reply to I.C. had directed them to proceed with the eviction.

In each of these cases, the United States citizens were able to establish the validity of their interests without recourse to

the Soviet courts. In the Soviet Union, probate matters are handled by notarial officers and do not reach the courts unless some party is dissatisfied with the ruling of the notary. Professor Berman has explained that the absence of any reported Soviet decisions expressly declaring that aliens enjoy inheritance rights by virtue of Article 8 reflects the fact that, "the action of Soviet notarial offices in transmitting the funds has never been challenged." (Berman, *Soviet Heirs in American Courts, supra,* 62 Colum.L.Rev. 257, 269.)

Despite the absence of cases involving direct challenges to the inheritance rights of aliens, certain decisions of Soviet courts, relating to various substantive questions of inheritance law, attest the viability of such rights since aliens appear in these cases as estate beneficiaries.

*Motsarsky* v. *Léonaïte,* decided by the Supreme Court of the Lithuanian S.S.R. in 1958[19] involved the application on behalf of an alien heir of those provisions of Soviet law which restrict a testator's freedom to disinherit his close kin.[20] In that case the decedent had undertaken to defeat the interests of his grandson, a nonresident alien, by making a will in which he left his property to the defendant Léonaïte, a Soviet citizen. The local notary, acting on the basis of the will, had awarded the estate to Léonaïte, but this action had been challenged by the grandson. The grandson instituted legal proceedings in a Soviet court but was unsuccessful. Eventually the case reached the Supreme Court of the Republic which held that the rights of the grandson in the estate property were governed by Soviet law and that he could not, therefore, be disinherited in favor of a stranger. The report of the case states: "In the field of inheritance, aliens are put on the same footing as Soviet citizens. Soviet successional law governs inheritance by an alien heir to property located in the U.S.S.R. . . . The alien who is an heir-at-law inherits under the same conditions as Soviet citizens and, whenever there does exist an heir-at-law, wills in favour of other persons become void."

In another illuminating case, *Sikora* v. *Cherkashina* (Presidium of the Supreme Court of Byelorussian S.S.R. 1957) Byulleten Verkhovnogo Suda S.S.S.R. [Supreme Court Bul-

---

[19] A report of this case, in English, appears in *Survey of Soviet Court Decisions,* Journal du Droit International (Paris 1960) 858, 863.

[20] Like other civil law jurisdictions, including Louisiana, the U.S.S.R. restricts the freedom of its citizens to favor strangers over legal heirs. See Comment, *Forced Heirs, the Legitime and Loss of the Legitime in Louisiana* (1963) 37 Tul.L.Rev. 710.

letin] 42, the nonresident heir of a Soviet citizen failed to assert her claim within six months as required by Soviet law. Accordingly, the notary awarded the estate property, a house, to other heirs. The foreign heir brought suit in a local Soviet court to set aside the action of the notary. The court rejected her plea and ruled that she had not advanced a sufficient explanation for her delay. The plaintiff then appealed to the regional court which ruled in her favor. This decision was reversed by the Civil Division of the Supreme Court of the Byelorussian S.S.S.R. The attorney general sought review on the plaintiff's behalf in the Presidium of that court which declined to reverse, holding that, "The fact that one of the heirs is an *alien* or that the heir *lives abroad* does not, in itself constitute sufficient ground for extending the delay of six months granted by law for accepting the succession." (Italics added.) The court noted that the plaintiff had waited four years before pressing her claim and that she had demonstrated none of the special circumstances which, under Soviet law, would have entitled her to an extension of time.[21]

A number of experts also refer to the *Pantke* decision as one involving a question of inheritance law raised by a nonresident alien beneficiary. An account of this case appears in Boguslavsky & Rubanov, *The Legal Status of Foreigners in the U.S.S.R.* (English version) at page 69. The authors there state that Erich Pantke, a "foreigner" and California domiciliary, initially renounced his interest in a Soviet estate in favor of his son, a Soviet citizen. Later, he claimed that his action had been predicated upon a misunderstanding of Soviet law. Eventually the Supreme Court of the R.S.F.S.R. reinstated his interest, invoking a provision of Soviet law which permits rescission of legal undertakings secured by fraud or predicated upon mistake.[22]

---

[21]The *Sikora* case is also significant as an illustration of the power of the Soviet attorney general to compel the rehearing of a case which would otherwise become final. It is particularly noteworthy that in *Sikora* the attorney general invoked this power on behalf of the alien heir.

In the present cases, our Attorney General undertakes to portray the power of his Soviet counterpart as one invariably used to defeat the interests of private litigants, and as one whose existence deprives all Soviet judgments of meaningful finality.

For a detailed discussion of "ex-officio review," as it is called, see 1 Gsovski & Grzybowski, *Government, Law and Courts in the Soviet Union and Eastern Europe* (1959) 536-540.

[22]The Attorney General notes that the authors do not clearly state that Pantke was an alien; however, examination of their book reveals that they consistently use the term "foreigner" to designate one who is not a Soviet citizen.

The fact that none of the courts involved in these cases felt moved to inquire whether aliens enjoy inheritance rights and that the courts so readily assimilated the rights of aliens to those which Soviet citizens enjoy in similar circumstances, making no mention of treaties as the foundation of such rights, affords significant confirmation of the view that the inheritance rights of aliens in the Soviet Union have never been doubted.

We recognize that the Soviet Union, as a civil law country, does not follow the rule of stare decisis and hence that the foregoing decisions do not carry the precedential force which attaches to the decisions of courts in common law countries. Nevertheless we believe that they have relevance to the present case as evidence of current Soviet practice in matters of inheritance involving aliens.

The Attorney General concedes that he has been unable to discover a single instance in which the Soviet Union has denied equal inheritance rights to a United States citizen or to any other alien. He urges, however, that this court adopt the holding of *Gogabashvele* that no quantity of evidence regarding Soviet law and practice in the field of alien inheritance can suffice to establish the reciprocity required by our statute because the structure of Soviet government and its commitment to the philosophy of communism make meaningless any talk of "inheritance rights" in a Soviet context.

In support of this position the Attorney General introduced evidence tending to establish that Soviet legal theory does not recognize the concept of "natural rights." The same proposition featured prominently in the *Gogabashvele* decision.

Even if we were to accept the hypothesis that a system of inheritance predicated upon "natural right" is, for that reason, more secure, we think it unlikely that the Legislature intended to impose such a requirement. Few nations could meet it; our own certainly could not. "[T]he right to succession [in California] is not an inherent or natural right. It is only by virtue of statute that an heir is given the right to receive any of his ancestor's estate." (*Estate of Simmons* (1966) 64 Cal.2d 217, 221 [49 Cal.Rptr. 369, 411 P.2d 97].) "Rights of succession to the property of a deceased, whether by will or by intestacy, are of statutory creation, and the dead hand rules succession only by sufferance. Nothing in the federal constitution forbids the legislature of a state to limit, condition or even abolish the power of testamentary disposition over property within its

jurisdiction.'' (*Irving Trust Co.* v. *Day* (1942) 314 U.S. 556, 562 [62 S.Ct. 398, 86 L.Ed. 452, 137 A.L.R. 1093].) ▆▆ ''So broad is the power of the state to determine the devolution of title to the property of a person dying and leaving property within its boundaries that it may take the property itself and deny any right of anyone to succeed thereto either by will or by succession. . . .'' (*Estate of Zimmermann* (1955) 132 Cal.App.2d 702, 704 [283 P.2d 68] ; see also *Estate of Bevilacqua* (1948) 31 Cal.2d 580, 582 [191 P.2d 752] ; *Estate of Knutzen, supra,* 31 Cal.2d 573, 578, and cases cited.) ▆▆ We conclude that the failure of the Soviet Union to ground its system of inheritance on the philosophy of ''natural rights'' does not prejudice the existence of reciprocal inheritance rights.

▆▆ Nor do we deem it significant that in actual practice the recognition of reciprocal inheritance rights with the Soviet Union may result in a greater flow of funds to Soviet beneficiaries than to citizens of California. In *Gogabashvele* the court placed particular stress on this fact, noting the possibility that the practice of the Soviet Union in permitting United States citizens to inherit is a ''matter of expediency and shrewd business.'' Similarly, the authors of a recent article suggest that American courts do, and by implication should, accord significance to the fact that Soviet beneficiaries may receive larger inheritances than their American counterparts.[23]

We cannot accept the hypothesis that the Legislature has directed us to calculate the relative ''balance of inheritances'' which would result from acknowledging that a given country accords reciprocity to our citizens. A law confining participation in California estates to the citizens of countries with which our ''balance'' may be favorable would have the most

---

[23]Bader et al., *Soviet Inheritance Cases in American Courts and the Soviet Property Regime, supra,* 1966 Duke L.J. 98, 109.

To our minds, the existence of an economic motive on the part of the Soviet Union to establish and maintain a regime of reciprocal inheritance rights with the United States make such a regime *more,* and not less, secure. In *Estate of Miller, supra,* 104 Cal.App.2d 1, the court upheld a finding of reciprocity with Nazi Germany noting: ''To an American it seems incredible that Hitler would permit German property to be distributed to Americans and particularly to American Jews. Yet, it definitely appears . . . that property of German testators was distributed to administrators appointed for the purpose of holding it for such enemies, including Americans. It may very well have been that Hitler, in spite of his hatred for both Jews and Americans, concluded that as a *matter of expediency and shrewd business* it was advisable to retain reciprocity with the United States. . . .'' (P. 11; italics added.)

limited ambit of operation. We doubt that any such country exists.

By far the largest portion of the *Gogabashvele* decision concerns itself with demonstrating that the institutions of Soviet government differ markedly from our own in such matters as separation of powers, independence of the judiciary and the degree to which governmental decisions reflect the views of the people. The court also took cognizance of the hostility which the Soviet government directs toward our nation and its foreign policy. Similarly, in the present case, the Attorney General introduced evidence demonstrating that Soviet institutions conform much less closely to traditional ideals of representative government than do our own.

Such evidence does not truly relate to the issues before us. ■ The Legislature did not undertake to confine inheritance to the citizens of nations whose institutions of government resemble our own or which ally themselves with us on the world scene. ■ As the court noted in *Estate of Miller, supra,* 104 Cal.App.2d 1, 12: "[S]ection 259 does not require that foreign countries have the same judicial system as ours, nor even an independent judiciary. All that it requires is that there be no discrimination shown in inheritance matters as between the nationals of that country and the residents and citizens of ours."

The Attorney General urges that the totalitarian nature of the Soviet Government militates against the existence of reciprocal inheritance rights by negating any secure expectation of American citizens that the Soviet Government will adhere to its present policy respecting the inheritance rights of aliens. He urges that "rights" in the Soviet Union, even when founded on statute, constitute no more than "conditional privileges" which the regime can abolish at will. Presumably this contention relates solely to the future since the Attorney General has adduced no evidence tending to show that Soviet law and practice to date have been anything less than uniform on the matter of alien inheritance rights.

Even if we were to accept the hypothesis that by reason of the Soviet Union's political structure the property and inheritance rights there recognized are more vulnerable to change, we question the relevance of that fact. Undoubtedly no meaningful establishment of "rights" can rest upon a government's sporadic or capricious recognition of them. On the other hand, the mere fact that a government possesses the power quickly to alter its institutions of property cannot be significant until and unless such potential is realized. In the

present world, we can hardly believe that the law of any nation or the existence of any government is impervious to radical change. If the Soviet Union should modify its present law and practice concerning inheritance by United States citizens our courts will have ample time and opportunity to bar the further participation of Soviet citizens in California estates.

Moreover, a construction of section 259 which would charge our courts with the duty of assessing the "democracy quotient" of foreign states and the degree to which they pursue foreign policies consistent with our own would imperil the constitutionality of the statute. In *Clark* v. *Allen* (1946) 331 U.S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 170 A.L.R. 953], the United States Supreme Court upheld the constitutionality of section 259 against a challenge that it represented a prohibited state venture into the field of foreign affairs. The court rejected as "farfetched" the contention of the challengers that the California Legislature had undertaken to stimulate foreign states to extend reciprocal inheritance rights to our citizens, a matter clearly within the exclusive competence of the federal government. The court considered that any effect which the statute might have on foreign countries was merely "incidental."

The commentators have seriously criticized the reasoning of the *Clark* decision. One writer declares that the court "grossly underestimate[d] the effect of the California statute on foreign relations" and that the decision is inconsistent with prior and subsequent court rulings. (Boyd, *The Invalidity of State Statutes Governing the Share of Nonresident Aliens in Decedents' Estates* (1963) 51 Geo.L.J. 470, 493-500; cf. Hawley, *Succession,* 1964 Annual Survey of American Law 585, 591.)

Similarly, Justice Douglas, himself the author of *Clark,* has declared that he believes the time has come to reconsider the rationale of that decision in light of the "notorious" practice of certain state courts "in withholding remittances to legatees residing in Communist countries" and thus affecting the foreign relations of this country in a manner not justified by any legitimate state interest in regulating the local aspects of inheritance. (*Ioannou* v. *New York* (1962) 371 U.S. 30 [83 S.Ct. 6, 9 L.Ed.2d 5], *per curiam* dismissal of appeal, Justices Douglas and Black voting to note jurisdiction, opinion by Justice Douglas.) Whatever the present status of the *Clark* decision, the construction of section 259 for which the Attor-

ney General contends in the present case goes well beyond that deemed "farfetched" in *Clark*.[24]

Accordingly, we conclude that the allusion in *Gogabashvele* to the particular structure and policies of the Soviet Union introduces factors which section 259 and the United States Constitution exclude from our consideration.

■ One further contention urged by the Attorney General does, however, deserve discussion: he raises the question whether the Soviet system permits the inheritance of significant property interests. Though section 259 in terms requires only equality of treatment for our citizens, we noted at the outset of this opinion the possibility that the statute necessarily imports a requirement that the property interests recognized by the foreign government, and thus inheritable by our citizens, be economically significant. Out of an abundance of caution, therefore, we review the available evidence bearing on the scope of the property interests recognized in the Soviet Union.

Though Marxist theory declares its opposition to institutions of property and inheritance, observers agree that the Soviet Union has found it economically and politically impossible to suppress them and that both are now secure and increasingly important elements of Soviet life.[25] Many American writers have traced the steady progress of Soviet inheritance law from the heady days immediately following the 1917 Revolution when, for a period of months, inheritance was ostensibly abolished. They concur in the view that the system of inheritance which now prevails in the Soviet Union cannot, except for minor details, be distinguished from that of other European nations. (Hazard & Shapiro, The Soviet Legal

---

[24]In the *Clark* case, the United States Attorney General termed our statute a "recurrent source of diplomatic friction." (Brief for Petitioner 75, *Clark* v. *Allen*, 331 U.S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 170 A.L.R. 953].)

Our own Law Revision Commission has written that section 259 has no proper role in keeping American assets out of the hands of hostile powers, noting that this "is a function more appropriately performed by the United States Government." (Recommendation and Study Relating to the Right of Nonresident Aliens to Inherit, *supra*, 2 Cal.Law Revision Com.Rep. p. B-5.)

[25]Professor Berman testified: "[T]here are many . . . areas of Soviet law . . . in which I would say that rights are far less secure than in the United States. But in the area about which I have been answering questions, the area of inheritance, the area of property, it seems to me that decades ago the Soviets came to the realization that they couldn't run their society, they couldn't command the support of their people without . . . having a rather strict enforcement of legal standards in the area of those limited private rights . . . which exist."

System (1962) Part III, pp. 51-53; 2 Gsovski & Grzybowski, Government, Law and Courts in the Soviet Union and Eastern Europe, *supra*, 1163-1174; Bader et al., *Soviet Inheritance Cases in American Courts and the Soviet Property Regime*, *supra*, 1966 Duke L.J. 98, 105; Western, *The New Codes of the Civil Law* (March-April 1965) Problems of Communism, 34-40; Ginsburgs, *Inheritance by Foreigners Under Soviet Law*, *supra*, 51 Iowa L.Rev. 16-18.)

Similarly, institutions of private property and substantial accumulations of private wealth, however inconsistent with Marxist theory, have expanded in response to economic and political imperatives. "[E]conomic levelling is no longer attempted but is directly condemned in Soviet Russia. High wages for the executive and technical personnel in government, industry and commerce, extra remunerations and bonuses given to the above as well as to inventors, scientists, writers and artists useful to the regime permit very considerable accumulations of money and properties. . . . One thing is clear: the possibility of an unearned income for the coming generations is established under the Socialist regime of present day Russia." (2 Gsovski & Grzybowski, Government, Law and Courts in the Soviet Union and Eastern Europe, *supra*, 1173.)[26]

Unquestionably, the range of items which can be owned by Soviet citizens and hence inherited by their American heirs is more limited than in our country. ▆▆▆▆ Soviet law permits no private ownership of "means of production" and prohibits "speculation" in securities and commodities. These restrictions do not, however, necessarily negate the existence of a meaningful regime of reciprocal inheritance rights unless the items which can be owned are so limited in number or value as to be economically negligible. In *Estate of Kennedy, supra*, 106 Cal.App.2d 621, 629, the court upheld a finding of reciprocity with Communist Romania, noting that: "It is not necessary to consider what the effect under our section 259

[26]Professor Berman has written to the same effect: "[T]here are many Soviet citizens who have, relatively speaking, large fortunes. They are, in the main, authors, artists, inventors and winners of various awards, a considerable number of whom have received the ruble equivalent of hundreds of thousands of dollars. Industrial managers and high officials often earn six or seven times the earnings of the average Soviet citizens. In fact, even people of modest income often manage to set aside money in savings accounts for emergencies or for their old age." (Berman, *Soviet Heirs in American Courts, supra*, 62 Colum.L.Rev. 257, 261-262.) He notes that savings accounts in Soviet banks totalled over ten billion rubles in 1960. (See also Maggs, *The Security of Individually Owned Property Under Soviet Law*, 1961 Duke L.J. 525, 526.)

might be if Romania were to nationalize every conceivable kind of property. ▓▓▓ Short of such a measure of nationalization, it is not reasonable to ascribe to our Legislature an intent to deny the right of inheritance to a nonresident alien merely because his government has embarked upon a program of socialization of industry. It is common knowledge that there is scarcely a government in Europe that has not embarked upon a program of socialization of industry in greater or less degree.''

▓▓▓ Although we have considered *supra* the evidence relating to the accumulations of personal property permissible in the Soviet Union, we must likewise deal with the ownership of real property; our statute requires a separate finding in that category. In the *Larkin* case, the trial court found that reciprocity with the Soviet Union does not extend to realty because of the fact that title to all Soviet land vests in the state. This limitation, however, does not affect the ownership of buildings; a building owner enjoys the indefeasible right to the perpetual use of the land supporting and surrounding his building and may assign this right upon sale of the building. (Maggs, *The Security of Individually Owned Property Under Soviet Law*, 1961 Duke L.J. 525, 526; Ginsburgs, *Inheritance by Foreigners Under Soviet Law*, supra, 51 Iowa L.Rev. 16, 27, fn. 21, 52; Berman, *Soviet Heirs in American Courts*, supra, 62 Colum.L.Rev. 257, 260.) We conclude that the restriction on the interests of real property owners in the Soviet Union incident to the government's retention of ultimate title to land does not reduce the value of such interests to a level of economic insignificance and thus defeat reciprocity.[27]

We conclude that the record clearly establishes that citizens of the United States enjoy a reciprocal right to inherit property from Soviet estates on the same terms and conditions

---

[27]A recent article undertakes to imply that the Soviet Union has embarked upon a program of confiscating houses acquired by inheritance or purchased with inherited funds. (Bader et al., *Soviet Inheritance Cases in American Courts and the Soviet Property Regime*, supra, 1966 Duke L.J. 98, 113-115.) Examination of the sources upon which the authors rely reveals that any such suggestion cannot stand analysis. The primary source cited by the authors is an article by the Dutch scholar Bloembergen. (Bloembergen, *Personal Property: Downward Trends* (March-April, 1965) Problems of Communism, 42.) In that article Bloembergen notes that recent Soviet legislation has authorized the confiscation of houses purchased with ''unearned income''—a category which includes the proceeds of embezzlement, bribery, and misdirecting the resources of state enterprises. Bloembergen specifically notes that a person accused of acquiring a house with ''unearned income'' may defend by showing ''that the money used was in fact legally received, *as for instance by inheritance*. . . .'' (P. 45; italics added.)

as Soviet citizens. The proof of the interpretation of Article 8 to that effect by the most distinguished authority in this country and the Soviet Union is massive. The evidence of the practical application of Article 8 in specific cases of inheritance is highly persuasive; no case to the contrary has been submitted. Although the Soviet system of law and government obviously differs radically from our own, that factor cannot be pertinent; moreover, any reliance upon the inapplicability of the theory of "natural law" in inheritance there fails utterly in view of its corresponding inapplicability in this state.

We acknowledge the possibility that the Soviet Union may, at some future time, change its law or depart from its established practice. Conceivably, such modifications may more easily occur in the Soviet Union because of the structure of Soviet government and its prevailing political philosophy than in some other countries. If and when such changes occur, our courts will have ample time to reconsider this question. In the meantime, we do not believe that this court can frustrate the wishes of Californians who elect to leave their estates to persons residing in the Soviet Union without imposing upon section 259 a construction at once foreign to the intentions of its authors and hostile to the supreme law of the land.

Whatever our reaction to the methods of the Soviet Union or its policies, we must scrupulously confine ourselves to the issues raised by our statute and permit the resolution of questions of foreign policy to rest with the federal government. To allow such considerations to flavor our decision would be to endanger the constitutionality of the statute and unduly to extend the province of this court.

In *Estate of Larkin* we reverse that portion of the judgment which orders escheat of the realty and direct the trial court to order distribution of the realty to the heirs in conformity with the views expressed in this opinion. In all other respects we affirm the judgments of the trial courts in both cases.

Traynor, C. J., Peters, J., Peek, J., Burke, J., and Schauer, J.,* concurred.

The petition of the defendant and appellant for a rehearing was denied August 31, 1966. Schauer, J.,* sat in place of Mosk, J., who deemed himself disqualified. McComb, J., was of the opinion that the petition should be granted.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.