## Lychis Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*James Francis Lawler*, for exceptants.

*James J. Phelan, Jr.*, for residuary legatee.

*Stanley F. Mankas*, for accountants.

*Melvin E. Soll*, for Commonwealth.

SAYLOR, J., November 17, 1967.—Four nephews and nieces of decedent named in his will as beneficiaries of a trust for $7,000, established to provide for payment of that amount to them as residents of Lithuania, have filed exceptions to the award of the fund to another legatee as remainderman because the trustees had not been able to effect the transfer of the funds to an "Iron Curtain Country" within the 10-year period fixed by testator.

Testator died December 22, 1952. His will dated August 29, 1951, was probated December 31, 1952. Upon the filing of a first account by the executors, there was an adjudication on October 8, 1953, by which, inter alia, the auditing judge awarded the sum of $7,000, less transfer inheritance tax, to the trustees named "for the uses and purposes set forth in the will".

Paragraph sixth of the will provides as follows:

"I give and bequeath to my Trustees, hereinafter named, the sum of SEVEN THOUSAND ($7,000.00) DOLLARS in trust to hold, invest and reinvest the same, to collect the income, and after paying all expenses incident to the management of the trust to pay over to my following named relatives the following

sums out of principal together with any applicable income earned: To the children of my brother, POVILAS LYCHIS, namely, ANELE, VYTANTAS and PETER the sum of TWO THOUSAND ($2,000.-00) DOLLARS each, and to my niece, AMELIA, the daughter of my sister, AGOTA PAGIRENES, the sum of ONE THOUSAND ($1,000.00) dollars. My aforesaid relatives were last known by me to be residing at Petrasunu Kaimas, Kriaunu Valscios, Rokiskio Apskrities, Lithuania. It is my desire and direction that this trust created for my aforesaid relatives shall terminate either entirely or pro tanto as soon as my Trustees can make proper contact with the said relatives and have them execute personal receipts for payments of the principal and income hereinbefore provided for them. And my Trustees in their own discretion shall be the sole judges as to whether and when proper contact has been made with the said beneficiaries and whether adequate and authentic receipts can be delivered by them for said payments without incurring any personal liability for any errors committed by them in paying out or witholding the corpus or income of this Trust. In any event and notwithstanding what has hereinbefore stated, it is my direction and desire further that in the event my Trustees are unable within a period of ten (10) years following my death to establish proper contact and arrange with any of the said beneficiaries to obtain an authentic receipt from him, her or them for payment of the said share of corpus or income as provided, then this Trust as to any such beneficiary or beneficiaries shall terminate at the end of such ten (10) year period and any sums of principal and income remaining unpaid shall revert to my residuary estate".

The matter to be determined is whether the trustees properly performed the duties imposed upon them by testator and the direction of the court within the

10-year period, or whether they failed to do so, in which event the fund should be awarded back to them to act as required by testator.

Clearly, testator wanted his named nieces and nephews to receive his bounty, if possible. To accomplish this, he directed his trustees: (a) to "make proper contact with the said relatives" and (b) to secure from them "personal receipts for payments of the principal and income hereinbefore provided for them".

The record shows that the trustees promptly accomplished the first mission. They confirmed the addresses of the relatives at the locality in Lithuania given in the will and established the fact that they were alive. They did not accomplish the second mission. No attempt was made to procure receipts from the beneficiaries. A review of the history of the trust indicates that the trustees failed to do all that they could and should have done to carry out testator's purposes.

The first and final account of the executors was filed September 28, 1953, and audited by Bolger, J. In his adjudication of October 8, 1953, he awarded to the trustees $7,000, less tax, in trust for Anele Lychis, Peter Lychis, Vytantas Lychis and Amelia Pagirenes (Cicinskiene) subject to the provisions of the will. The schedule of distribution approved December 17, 1953, provided for the payment to the trustees of $7,000, less transfer inheritance tax of $1,050, or a net amount of $5,950.

In 1958, Philadelphia attorneys served upon trustees' counsel powers of attorney executed by the four beneficiaries, acknowledged before Lithuanian or Russian officials, and certified by the American Consul as to the signatures but not as to the "authenticity of the persons signing the powers".

In December 1960, counsel for the trustees wrote to the beneficiaries asking them to confirm whether they

had local representation. Similar responses were received from all four beneficiaries. While they made no reference to the inquiry about representation, all beneficiaries stated that they were alive and wanted the funds to be sent directly through the mail to them and not through Moscow. These letters are in the record, together with translations from the Lithuanian language.

On September 2, 1964, the attorneys for three of the beneficiaries of the said fund filed a petition praying for a citation directed to the trustees to show cause why they should not make distribution of the trust fund created in the sixth clause of decedent's will to the named beneficiaries. The petitioners stated that, although more than 11 years had elapsed since the grant of letters and the first complete advertisement thereof, the trustees had made no distribution of the trust fund, although proper contact could at all times have been made with the beneficiaries, and personal, adequate and authentic receipts could have been secured from the beneficiaries upon payment to them of their shares of the trust.

Upon citation being issued and served, answers to the petition were filed by one of the trustees and by the Commonwealth of Pennsylvania. The trustee admitted that no distribution of the trust fund had been made but denied that the trustees "have failed to make contact with the beneficiaries of the said trust." On the contrary, the trustees averred that "they have received through their attorney responses from the aforesaid beneficiaries in which each of the said beneficiaries directed the proceeds of the trust fund to be mailed to them directly and not through official channels through the Soviet Government". It was further averred that as "the beneficiaries are residents of Lithuania, which is a country designated on the restricted list of the United States Government, United

States Treasury and State Departments, and also under the so-called Iron Curtain Acts of the Commonwealth of Pennsylvania, they have refrained from directly making distribution of the said trust fund to the named beneficiaries".

In its answer to the petition the Commonwealth demanded proof that the petitioners are the attorneys for the beneficiaries and joined in the petition "to require the trustees to show cause why distribution should not be made under the Iron Curtain Act of July 28, 1953, or, in the alternative, under Section 1314 of the Fiscal Code": 20 PS §1155, P.L. 674, sec. 1.

The petition and answers were assigned to Judge Bolger, who held a hearing on December 14, 1964, at which it was stated that the trust fund amounted to $8,500, that responses had been received by counsel for the trustees in 1953 from two of the beneficiaries, who wrote that the other two were in the army, that the beneficiaries were all alive and that they had stated that "we request of you that for the time being you do not send our legacies to us". Stanley F. Mankas, counsel for the trustees, stated that on six other occasions he attempted to communicate with the beneficiaries but received no response. Mr. Mankas further stated that the trustees are satisfied that testator wanted his nephews and nieces to be the principal beneficiaries of the trust fund, and that they were living, but that the trustees have refrained from paying over the funds in view of the Commonwealth's having an interest and of the fact that there is a residuary beneficiary. Counsel also stated that he did not "recall receiving any undelivered letters back to this country". He admitted that the trustees had not at any time made any attempt to transmit any amount of money in order to obtain a personal receipt "and that counsel knew that there was an agency in Philadelphia that would transmit packages to Lithuania".

At the conclusion of the hearing on December 14, 1964, the hearing judge said that he thought an account should be filed and that there should be a certification with respect to the matters upon which counsel for the trustees had been interrogated or respecting the efforts and success or lack of success since then in complying with the terms of the will.

On February 17, 1965, the trustees filed their first and final account of the trust. At the audit, the testimony of Mr. Mankas, attorney for the trustees, taken at the hearing, was made part of the record, and additional testimony was given.

Mr. Mankas stated (1) that he was satisfied that the beneficiaries had executed the powers of attorney presented by counsel as he had confirmed the signatures with those on letters he had received directly from the beneficiaries; (2) that the beneficiaries were not sufficiently learned to understand what he was asking in the matter of their acknowledging execution of the powers, and (3) that he made no judgment on the validity of the powers and asked to be directed by the court "to explore further with these people whether they, in fact, can execute these receipts, whether in fact they have executed these powers, whether they should give us an affirmative statement".

Alphonsus A. Kanetsky, a trustee, testified that he knew decedent very well, that decedent had talked to him about the gift to the Lithuanian relatives, and that it was only in case the trustees could not find them that the residuary legatee was to receive the funds. This was due to the fact that at the time of the conversation there was difficulty in communicating with Lithuanian residents. Mr. Kanetsky did not communicate with the beneficiaries, leaving that to his counsel, who informed him of the correspondence, nor did he send any money or packages to Lithuania, although he had friends and relatives who sent clothes and

408

shoes but not money to relatives in that country. He stated that he is an uncle of Joseph Howdershell, the residuary legatee named in the will as the beneficiary if the Lithuanian heirs did not receive the fund.

Zigmas Kristaponis, the other trustee, testified that he had known testator since 1918 and had been told by him that he had left a legacy for his relatives in Lithuania, and that he wanted above all things that they receive the bequest of $7,000 if they were alive. The witness said he left to counsel the matter of communicating with them and he himself never tried to send them any money or packages. He was not permitted to answer the question as to whether he had friends who are presently transmitting money or packages to Lithuania. Objection thereto on the ground that he was not an expert was sustained.

Maurice Rifkin testified that he is president and owner of practically all of the stock of Globe Parcel Service, Inc., a Pennsylvania corporation engaged in mailing packages and money to Lithuania and the U.S.S.R., that from 1953 to date the company has received parcels almost daily, that international postal receipts therefor are obtained, and that the parcels sent to the U.S.S.R. average about 2,000 a month. The records are not analyzed, but the witness stated that five or perhaps 10 percent go to Lithuania judging from the number of clients who come in and speak the Lithuanian langauge. Mr. Rifkin testified further that out of 2,000 parcels a month shipped by his firm, there would be only five or 10 inquiries as to whether or not the parcels were delivered, that sometimes there is a delay for some reason or other, and there are not more than one or two complaints a month as to nondelivery. The parcels are taken to the United States Post Office and a pink card is sent off with each parcel. Upon delivery of the parcel to the recipient, his local Post Office obtains the recipient's signature and the

receipt is delivered to the company by the United States Post Office. The witness stated further that his company judges that the receipts are authentic, for the people who send the parcels come in and send parcels over and over again. Furthermore, the receipts are further substantiated by personal letters to the senders. This witness stated that, if requested to transmit parcels to the beneficiaries of this estate and given their addresses, receipts could be obtained from them in the normal course of business.

Mr. Rifkin testified that he himself has sent gift parcels to relatives and friends in the U.S.S.R. and obtained receipts, the signatures on which he knows and recognizes as valid and with which he is satisfied. His company is registered with the Department of Justice and its operations are carried on through Vneshposyltorg, a firm which handles deliveries under rules and regulations of the Soviet Union. It owns no part of the Globe Parcel Service, Inc. There are four more such companies as his in the United States, three of which have branches in Philadelphia. The duty on the parcels is collected by the companies from the sender; otherwise, the recipient would pay the duty in the U.S.S.R. upon receipt of the parcels. A license form is issued in triplicate, one for the sender, one for the customs and one for the recipient who checks the contents of the parcel with the form before he signs the receipt upon delivery of the parcel. The company makes a small service charge for the handling of the parcels in the U.S.S.R., collects the charge, the postage, the insurance premium and the customs duty from the sender of the parcel and issues a receipt to him. This entire procedure is registered with the United States Department of Justice and the Department of Commerce.

Mr. Rifkin added that the cost of the merchandise transmitted in the parcels is far less than the value

thereof in the U.S.S.R., due to the fact that such merchandise is in much greater supply in the United States than in the Soviet Union, between four and five times as much. Hence, the postal and handling charges and the customs duties are small in comparison with the values received in Russia.

Robert Silberstein, a member of the New York State bar, testified that since 1932 he has been a member of the firm of Wolf, Popper, Ross, Wolf and Jones, of New York City, being in charge of the department handling foreign estates, including the present one. As such, he obtained the powers of attorney from the beneficiaries living in Lithuania.

Counsel for the beneficiaries offered to prove by the testimony of a witness who was born in Lithuania and was formerly a lawyer and judge of that country, that he had sent funds in substantial amounts to an heir in Lithuania and had had no problem procuring a receipt therefor. Objection thereto was sustained.

The auditing judge, in his adjudication of July 6, 1967, held that the testimony of the trustees regarding the intentions of testator were irrelevant, the words in the will being the important evidence of intention. He also found that the trustees had not abused their discretion in not transmitting the funds to the Lithuanian beneficiaries, as they had determined that the latter could not give proper receipts because they would not have the use, benefit, enjoyment and control of the funds. Therefore, concluded the auditing judge, the 10 years prescribed by testator having elapsed, the interest of Joseph Howdershell vests and the principal must be awarded to him.

The exceptants assert, inter alia, (1) that the auditing judge committed error in awarding the trust funds to the residuary legatee instead of awarding them back to the trustees with direction to make immediate distribution to the Lithuanian beneficiaries;

(2) in applying the test of use, benefit, enjoyment and control of the trust as these words do not appear in the provisions of the will establishing the trust; and (3) in finding that the trustees did not abuse their discretion when they made no effort to transmit funds to the claimants and to obtain receipts as required by the testator, etc.

Lithuania is, and since 1952 has been, a constituent part of the United Soviet Socialistic Republic. It is a so-called Iron Curtain country which is on the proscribed list of the Federal Treasury Department. Therefore, government funds may not be transmitted to residents of that country. However, as Federal regulations permit transmission of moneys and parcels to that country by individuals in the United States, there appear to have been no reasons why the trustees should not at least have attempted to send parcels during the 10-year period following testator's death.

It is acknowledged that the four beneficiaries of the trust were living during the said 10-year period, that their respective residences were known, that their identity had accordingly been established, that letters had been received from them verifying these facts and that undisputedly it was the will of testator that they receive the funds once their existence and their addresses were established. The next step to be taken by the trustees, as dictated by testator, was to procure from any or all of such beneficiaries personal receipts for payments made to them. That step was never taken. The only reason that has been offered by the trustees for their inaction in that regard seems to be their doubt as to the effect of the so-called Iron Curtain Act of 1953. There is nothing in the record to show that the recipients of parcels would not have had the use, benefit, enjoyment and control thereof.

When in 1960 the trustees received from all of the beneficiaries requests that funds should be sent to

them directly and not through Moscow, the trustees should have complied. Whether or not by use of the word "Moscow" the beneficiaries meant the government of Russia is of no import. As it is the United States Post Office Department that handles funds and packages transmitted to residents in the U.S.S.R., and as it is that country's postal service that delivers the mail to such residents and sends their receipts therefor to the United States for delivery here, it does not seem unreasonable for the beneficiaries to have made the request. The query is: Why did the trustees fail or refuse to send money or parcels at any time during the 10 years they had the wherewithal to do so and to carry out testator's intent and the court's direction? Had they or their attorney any doubt about the propriety of so doing, they could have filed an account and sought court approval.

The testimony of Mr. Rifkin is that of an expert in the field respecting which he testified. The testimony of others who have sent packages to Russia has buttressed and confirmed it. It has been shown conclusively that it is, and for some time past has been, a routine procedure to obtain authentic receipts for parcels sent through the Post Office to residents in the U.S.S.R. That being the case, the trustees breached their fiduciary duty in failing to attempt to follow that procedure and in failing to send packages to the Lithuanian heirs, thereby seeking to secure adequate and authentic receipts from them.

There is precedent in this court for fiduciaries sending packages to residents in the U.S.S.R. In the Estate of Wladyslaw Lewicki, Deceased, no. 3124 of 1936, and in the Estate of Harry Slotkin, Deceased, no. 2062 of 1957, the auditing judges filed adjudications approving accounts wherein credit was taken in substantial amounts for shipments of packages to the U.S.S.R.

In the Estate of Ida Vaieiuniane, Deceased, no. 3133 of 1944, the executor, who was the residuary legatee under the will, without the knowledge of his counsel and without authority from this court, made distribution of $3,000 to an heir living in Lithuania. At the audit of the account it was revealed that this amount had been given in the will to the executor to use "for the purpose of sending packages through the Globe Parcels Service to one Barbora Didziokiene", whose address in Lithuania was given in the will. Counsel for the executor informed the court that his client was a former judge of the Lithuanian civil and criminal courts and was "under the apprehension as the named legatee that this was his money with the moral obligation attached to it". He added that "We have gotten all the receipts that were forwarded by the Globe Parcel Service with the handwriting of the recipient". Subsequently, letters from her confirmed this fact. In his adjudication in that case, dated April 26, 1965, Judge Bolger stated that "the court cannot condone this action even though made with the utmost good faith", and stated further: "Therefore the awards to be made hereunder to the beneficiary will be made without prejudice to the right of Barbora Didziokiene at any future date to appear and prove that she did not in fact receive $3,000 worth of packages from the accountant".

While the facts and circumstances of those cases are not identical with those before us now, they do show recognition of the realities of the situation. Packages sent to the U.S.S.R. have been received by the beneficiaries there resident, and their authentic receipts therefor have been delivered to the senders.

In Mondal Estate, 41 D. & C. 2d 570 (1967), where decedent left a portion of the residue of her estate in trust and directed that the trustees in their absolute discretion use the income and all or any portion of the

principal for the "benefit of all, any or either of" four named beneficiaries, and gave additional powers to the trustees with respect to the fund, it was held that the claimants to the fund were not "beneficiaries entitled to share in the distribution as defined in the so-called 'Iron Curtain Act of 1953' ". In the course of his opinion for this court, sitting en banc, President Judge Klein found that the case did not fit into any of three categories in which alone the provisions of the act give custody of a fund to the Commonwealth. In so finding, he said, at page 576:

"This does not mean that trustees in the present case may send money or property to the relatives in Russia if it appears clear that the distributees would not have 'the actual benefit, use, enjoyment or control' thereof. What it does mean is that the primary right to make this determination is placed in the discretion of trustees, and not in the court. Trustees must exercise the same common skill, common prudence and common caution that is demanded of all trustees in the performance of their duties. The manner in which trustees exercise their discretion is subject to the control of the court in this case, as in every other similar case, to prevent trustees from abusing the discretion which has been vested in them by testatrix, or from administering the trust in a negligent manner".

In the case before us, it is clear that the trustees did not perform fully the duties imposed upon them by the testator. They abused their discretion in failing to attempt to procure "adequate and authentic receipts" from the beneficiaries who are the primary objects of testator's bounty. Thereby they denied enjoyment thereof by the Lithuanian legatees, and by their inaction during the 10-year period prescribed in the will, made it possible that the entire fund would be turned over to the residuary heir, who is a nephew of

one of the trustees. This court should not countenance such conduct nor permit the accomplishment of such a result.

The trust will not terminate on the expiration of the 10-year period if during that period the purposes of the trust have not been accomplished and if testator manifested an intention that the trust should continue until the accomplishment of its purposes. The fixing of the period may be construed as being merely directory. The trustees have the power to send parcels to Lithuania even though the 10-year period has ended: Restatement of Trusts 2d §334, pages 151-152.

The Iron Curtain Act of 1953 must not be treated as outlawing distribution to foreign legatees residing in Iron Curtain countries. As was said by the Supreme Court in Wanson Estate, 419 Pa. 109, 113 (1965), it "authorizes the court, on an ad hoc basis, to determine the time and manner of distribution or, in the alternative, to direct a protective, custodial interest-bearing deposit until the money can safely and feasibly be placed in the beneficiary's hands".

The trustees erred in assuming that under the provisions of the Iron Curtain Act of 1953 the objects of testator's bounty would not have the "actual benefit, use, enjoyment or control" over the property to which they were entitled. Testator's will provided that the trustees were "to pay over to" his nephews and nieces the specific amounts designated by him. He further provided that the trust created for their exclusive benefit was to terminate when the trustees had made proper contact with them and had had them execute personal receipts for such payments.

In Brown's Appeal, 345 Pa. 373 (1942), it was stated, at page 379:

"While a court cannot control the discretion conferred upon a trustee it may compel him to exercise it in good faith and within the bounds of a reasonable

judgment, and it may also interpose where he fails to use his judgment at all because of a mistaken view, either of fact or law, as to the extent of his powers or duties".

In Damiani v. Lobasco, 367 Pa. 1 (1951), the Supreme Court said, at page 7:

"To the extent to which discretion is conferred upon the trustee, the exercise of the power granted is not subject to the control of the court, except to prevent an abuse by the trustee of her discretion".

In Brainard v. The Merchants and Manufacturers National Bank of Sharon, 37 D. & C. 2d 325 (1965), it was said, at page 331:

"Resort must be had to the instrument itself to define the limits of a trustee's powers, for much will depend on whether there is any standard by which the trustee's conduct can be judged. Scott on Trusts, Vol. 2, §187".

Here, through the inaction of the trustees during the 10-year period, they committed an abuse of discretion. Actually, there was more than a discretion conferred on the trustees. There was imposed upon them a duty which they failed to perform. Where the power conferred is imperative, "there is a positive duty to perform the act in question": Bogert, Trusts 2nd Ed. §552.

Accordingly, it is in order here for the court to direct the trustees to keep the fund on deposit in an interest-bearing account as was done in Kulchinsky Estate, 37 D. & C. 2d 633 (1966). Thereby, the interests of the legatees will be protected, the trustees will have opportunity to do their fiduciary duty, and the alternative to the payment of the fund into the State Treasury under the 1953 Act will be followed.

Accordingly, the court enters the following

DECREE

And now, November 17, 1967, the exceptions to the adjudication dated July 6, 1967, are sustained, the

adjudication is amended and the award of the remainder to Joseph Howdershell is set aside, and, in lieu thereof, the fund, principal and income, bequeathed in item sixth of the will is awarded back to the accountants in further trust for the uses and purposes recited in the will; and the said trustees are directed to proceed forthwith to obtain "adequate and authentic receipts" from the beneficiaries residing in Lithuania for periodic shipments to them of packages costing not more than $200 to each of said beneficiaries in any one month, and if a receipt for each shipment, properly executed, is not received and submitted within 90 days to Herbert W. Salus, Jr., Esq., Special Assistant Attorney General, or his successor, and to the trustees, or their successors, no further shipments shall be made to such beneficiary, and providing that the trustees shall report to the auditing judge the results of their efforts within 90 days of the date hereof.

## DISSENTING OPINION

BOLGER, J.—In Mondal Estate, 41 D. & C. 2d 570 (1967), this court held that the "Iron Curtain" Act of 1953 has no application to a case wherein a fiduciary is in possession of money or property which is not distributable as a matter of right to a beneficiary. It was held that where a fiduciary has discretion to withhold payment, then the award must be made to him and not to the Commonwealth as custodian under the 1953 Act. The court then explained:

"This does not mean that trustees in the present case may send money or property to the relatives in Russia if it appears clear that the distributees would not have 'the actual benefit, use, enjoyment or control' thereof. What it does mean is that the primary right to make this determination is placed in the discretion of trustees, and not in the court. Trustees must exercise the same common skill, common prudence and

common caution that is demanded of all trustees in the performance of their duties. The manner in which trustees exercise their discretion is subject to the control of the court in this case, as in every other similar case, to prevent trustees from abusing the discretion which has been vested in them by testatrix, or from administering the trust in a negligent manner".

The Mondal decision makes it clear that discretion to distribute or not was in the trustees. Their exercise of that discretion is subject to control of court to prevent abuses. However, it is clear from the record of this case that there was no abuse of discretion: (1) During the 10-year term of this trust, 1952-62, the trustees relied upon the advice of their counsel that this court would not permit the sending of money or goods to the beneficiaries in Lithuania; (2) the difficulty in communicating with the Lithuanian beneficiaries and the communications themselves raised what may be termed reasonable doubt as to whether "proper contact" had been made and whether "adequate and authentic receipts" could be obtained; (3) consideration must be given to the background of political and economic conditions in the Soviet Union as they existed at that time, being careful not to apply present-day conditions, and also to the background of the attitude of this court as embodied in decisions such as Zupko Estate, 15 D. & C. 2d 442, 9 Fiduc. Rep. 78 (1958), and in Philadelphia O. C. Rule 69.6. These factors indicate clearly the reasons the trustees did not send money or parcels. It is difficult to discern how such action can constitute an abuse of discretion. I would affirm.