Belemecich Estate.

Argued June 5, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused July 23, 1963.

C. *Francis Fisher,* with him *R. Paul Lessy,* and *Brenlove & Fisher,* for appellant.

*Vincent X. Yakowicz,* Deputy Attorney General, with him *Walter E. Alessandroni,* Attorney General, for Commonwealth, appellee.

*R. J. Lucksha,* amicus curiae, in propria persona.

OPINION BY MR. JUSTICE MUSMANNO, July 2, 1963:

Anton Belemecich, a resident of Delaware County, died intestate on October 13, 1958, leaving some $70,000. His estate was administered in the orphans' court of that county, which determined the heirs at law to be a sister, a nephew and three nieces living in Yugoslavia. The auditing judge ordered the funds in the hands of the fiduciary to be paid to the Department of Revenue of the Commonwealth of Pennsylvania without escheat, in compliance with the Act of July 28, 1953, P. L. 674, §2, 20 P.S. §1156, which provides: "Whenever it shall appear to the court that if distribution were made a beneficiary would not have the actual benefit, use, enjoyment or control of the money or other property distributed to him by a fiduciary, the court shall have the

power and authority to direct the fiduciary (a) to make payment of the share of such beneficiary at such times and in such manner and amounts as the court may deem proper, or (b) to withhold distribution of the share of such beneficiary, convert it to cash, and pay it through the Department of Revenue into the State Treasury without escheat."

This Act carries the sobriquet of "Iron Curtain Act" because its purpose is to protect the moneys, physically in America, but belonging to people who fatefully find themselves behind the Iron Curtain of Communism. It is a commendable and salutary piece of legislation because it provides for the safekeeping of these funds even with accruing interest, in the steel-bound vaults of the Commonwealth of Pennsylvania until such time as the Iron Curtain lifts or sufficiently cracks to allow honest money to pass through and be honestly delivered to the persons entitled to them. Otherwise, wages and other monetary rewards faithfully earned under a free enterprise democratic system could be used by Communist forces which are committed to the very destruction of that free enterprising world of democracy.

The Consul General of Yugoslavia, Drago Novak, who appeared at the hearing before the orphans' court as an attorney-in-fact for the named heirs of Anton Belemecich, excepted to the findings of the court. His exceptions were dismissed and the court then amended its adjudication to allow $500 to be paid to each of the heirs through the attorney for the Yugoslavian consul who was charged "with the responsibility of securing receipts in writing, containing completely-itemized statements of any and all expenses, charges and deductions, if any, which may have been made, and the exact amounts actually received by the distributees respectively, shall be submitted to the Court for inspection immediately upon delivery to the distributees."

The court ordered further that the distributees be permitted to make requests of the court for additional payments at appropriate times. The Yugoslavian consul appealed, contending that the orphans' court erred in concluding that the heirs of Anton Belemecich would not have the actual benefit, use, enjoyment and control of the money due them from the estate in question.

In its adjudication the court said: "There can be no doubt that Yugoslavia is a self-proclaimed Communist state. The fact that there may be at the moment some ideological differences between the U.S.S.R. and Yugoslavia does not change the totalitarian complexion of the present regime in Yugoslavia nor does that government's philosophical, economic and political concepts of the right of a state to confiscate private property without just compensation to the rightful owners inspire this court with any confidence that an award to residents of Yugoslavia would meet the objectives of the public policy of the Commonwealth as enunciated by the legislature in the so-called 'Iron Curtain Act.' "

The appellant, in one of his exceptions in the court below, maintained that "there is no legally competent evidence before the Court from which it can be found or concluded that Yugoslavia is an 'Iron Curtain' Country."

To argue that Yugoslavia is not behind the Iron Curtain is to argue that it is not on the eastern side of the Atlantic Ocean. There are certain well-known, indisputable geographical and historical facts which require no substantive proof in Court, and one of those irrefutable, if unfortunate, realities, is that Yugoslavia, as the court below found, is a satellite state where the residents have no individualistic control over their destiny, fate or pocketbooks, and where their politico-economic horizon is raised or lowered according to the will, wish or whim of a self-made dictator.

President Judge ROBERTS of the Orphans' Court of Erie County, now Justice ROBERTS, said in the case of

*Dopierala Estate,* 7 Fiduc. Rep. 262, 263 : "It is notorious and regrettable that the unfortunate people of Poland and other residents enslaved behind 'Iron Curtain' dictatorship are denied basic human and property rights. Common knowledge and experience indicate that funds transmitted to residents, subject to police state absolutism, rarely reach the intended individual. More frequently the funds are wholly or partially confiscated by unfair rates of exchange or by other direct or indirect police state pressures or devices exerted against the intended recipient or his family, either by the government itself or by its unscrupulous officials or functionaries. *Of these deplorable facts we take judicial notice,* and upon careful consideration of all the attending circumstances, as they now appear, we find that if distribution to this beneficiary were made, she would not have 'the actual benefit, use, enjoyment or control' of her inheritance." *

President Judge JONES of the Orphans' Court of Luzerne County, now Justice JONES, said in *Estate of Frank Wozniak,* 44 Luz. L. Reg. Rep. 227 : "The instant petition requests that funds of one of our deceased nationals be turned over for transmittal to an heir behind the 'Iron Curtain' of Poland, without any convincing assurance or guarantee that the decedent's heir will have the actual benefit, use, enjoyment or control of this fund, and that this fund will not be subject to confiscation in that country. *It is common knowledge that the present Polish national* government is a satellite of the U.S.S.R. The bank to which these funds will be initially transmitted in Poland is under the authority of that satellite government, *and the tribunals which would furnish the receipts are tribunals of that satellite* government. Until world conditions change and there can be assurance that these funds of a deceased national will be properly transmitted to his heir in Poland who

---

* Emphasis throughout supplied.

will have the freedom to use, and enjoy these funds, we refuse to permit the funds to be taken from our control."

All the known facts of a Sovietized state lead to the irresistible conclusion that sending American money to a person within the borders of an Iron Curtain country is like sending a basket of food to Little Red Ridinghood in care of her "grandmother." It could be that the greedy, gluttonous grasp of the government collector in Yugoslavia does not clutch as rapaciously as his brother confiscators in Russia, but it is abundently clear that there is no assurance upon which an American court can depend that a named Yugoslavian individual beneficiary of American dollars will have anything left to shelter, clothe and feed himself once he has paid financial involuntary tribute to the tyranny of a totalitarian regime.

At the hearing before the lower court, Julius Rothkopf, a native Yugoslavian lawyer, who had practiced his profession in Yugoslavia for 19 years before coming to America, and who has since continued his studies of Yugoslavian law, keeping abreast of all developments in his mother country, testified to the chains of economic restrictions which bind Yugoslavian citizens. He spoke also of penalties for "economic crimes." This witness's testimony confirmed and verified the conclusions reached through the process of judicial notice.

Drago Novak, the Yugoslavian consul general already mentioned, asserted gravely in court that the flag of freedom had never been furled in Yugoslavia and that there are no restrictions on private ownership or means of production in that country. He did, however, grant that no Yugoslavian could own more than three houses or employ more than five workers, but he said that any citizen could own up to fifteen automobiles! He did not explain this generosity in vehicular ownership but it could possibly be explained on the

basis that there is no reason to limit the unattainable nor is there anything to lose in allowing a dreamer the felicity of his fantasies.

The judge, who heard and saw Drago Novak, obviously placed very little credence in what he said. Novak's testimony, as it appears in the record, does not gather any gloss of increased reliability because of its now being in print. He testified, for instance, that on a trip he made to Yugoslavia he learned of an instance, where a Yugoslavian received $200,000 from someone in Louisiana. At the then exchange rate of 600 dinars per dollar, this meant that this Yugoslavian staggered away from the bank with baskets overflowing with 120,000,000 dinars. Novak was unable to give the name of this mythical Yugoslavian nor describe what were the circumstances which precipitated this avalanching of dinars to this one person in Yugoslavia.

Apparently emboldened by his own audacious utterances, Novak further declared that if money from an estate in Pennsylvania were sent to Yugoslavia, the government of that country would not impose any tax on the money. Since it was the responsibility of the court below to ascertain the facts, we have no difficulty in understanding why it refused to rest its decision on the atmospheric blocks of testimony supplied by Drago Novak.

One revelatory feature in the proceedings below should not go unnoticed in this appellate review. The decision swings on the hinges of the proposition: Can our Courts be assured that the heirs of Anton Belemecich living in Yugoslavia will actually hear the merry jingle in their pockets of the money left them by their kinsman in the United States? The attorney for the Yugoslavian consul argued that the evidence showed that: "It is positive that a resident and citizen of Yugoslavia would have the actual benefit, use, enjoyment and control of the funds in question if they were transmitted to Yugoslavia."

Yet, when the Orphans' Court of Delaware County ordered that $2500 be sent to the heirs under the care and guidance of this same attorney, he rejected the opportunity to put into effect the very thing he was arguing for. He declared: "If, in good faith, such attorney were to send money orders to such heirs, upon condition that he received satisfaction of award from the recipients, he would have no way of determining whether such funds were intercepted and the receipts forged."

He made it even stronger: "In the absence of a means or method that would insure the receipt of such funds by the proper persons, the attorney designated by the Orphans' Court to act as a conduit, hereby rejects such appointment."

If the attorney cannot be assured that $2500 would not be intercepted, that the funds would not be taken by the Yugoslavian Government and the receipts forged, what possible assurance could there be that the total amount of approximately $70,000 would reach those entitled to it? As the attorney for the Commonwealth well put it in his able brief: "We submit that appellant has decimated his own argument."

The appellant argues also that the order of the court below offends against the treaty of 1887 between the United States and Serbia (the prodecessor sovereign nation of the Republic of Yugoslavia.) The point is not well taken. That treaty provides briefly that there shall be reciprocal rights of inheritance between the citizens of the two nations. Under the decision in this case, there is no denying to the citizens of Yugoslavia the right of inheritance through American relatives. The Act of the Legislature, upon which the Court based its adjudication is intended, not to breach the sanctity of the treaty mentioned but to guarantee that its provisions are upheld so that the beneficiaries will actually and not only technically or figuratively receive the amounts due them.

Nor does the case of *Kolovrat v. Oregon*, 366 U. S. 187, cited by the appellant, help his position. The Oregon statute involved in that litigation was a confiscatory one. The one before us is merely custodial. The heirs here have $70,000 coming to them. When the day arrives that the Iron Curtain of distrust and hostility shutting them off from the free world, melts and is molded into an open portal of understanding, good will and mutual respect, then the money left them by their brother and uncle, and which will have been safely kept for them by the Commonwealth of Pennsylvania, will be turned over to them. And let it be hoped that this will happen while there is still healthful life in the beneficiaries so they may enjoy freely and to the utmost the munificence of their kinsman buried in the free land of America.

Affirmed. Costs to be borne by the Estate.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

I feel we are bound by *Kolovrat v. Oregon*, 366 U. S. 187, 198 (1961). In that case, the United States Supreme Court held that a treaty entered into in 1881 between Serbia and the United States was in force between Yugoslavia and the United States and that the Oregon statute limiting the right of nonresident aliens to take either real or personal property in Oregon by succession or testamentary disposition was of no legal effect in so far as it was inconsistent with the treaty. The unanimous opinion stated, inter alia: "These treaties and agreements show that this Nation has adopted programs deemed desirable in bringing about, so far as can be done, stability and uniformity in the difficult field of world monetary controls and exchange. These arrangements have not purported to achieve a sufficiently rigid valuation of moneys to guarantee that

foreign exchange payments will at all times, at all places and under all circumstances be based on a 'definitely ascertainable' valuation measured by the diverse currencies of the world. Doubtless these agreements may fall short of that goal. But our National Government's powers have been exercised so far as deemed desirable and feasible toward that end, and the power to make policy with regard to such matters is a national one from the compulsion of both necessity and our Constitution. After the proper governmental agencies have selected the policy of foreign exchange for the country as a whole, Oregon of course cannot refuse to give foreign nationals their treaty rights because of fear that valid international agreements might possibly not work completely to the satisfaction of state authorities."

Since I find that the provisions of the "Iron Curtain Act" in question here are likewise inconsistent with this treaty, I must dissent.