Wanson Estate.

Argued April 28, 1964.   Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Don W. Llewellyn,* with him *Souder and Schoelkopf,* for appellants.

*Clark Wesley,* with him *Edward J. McGlinchey,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, September 29, 1965:

Rudolf Wanson died March 26, 1957, a resident of Montgomery County, Pennsylvania. By will dated April 23, 1956, he bequeathed the residue of his estate equally to four relatives and a friend, all citizens and residents of Rumania.[1]

The will also provided: ". . . if at the time of my death the Laws of the United States of America, or the Laws of Romania prevent or prohibit the distribution of my Estate to the above-named Citizens of Romania, then and in that event, I give devise and bequeath the aforementioned remainder of my Estate . . . to my friend, Marion Hampel, of Philadelphia, Pa. . . . ."

The Orphans' Court of Montgomery County held that at the time of testator's death the Pennsylvania "Iron Curtain Act"[2] prevented distribution of his estate to the Rumanian legatees. Acting pursuant to the testamentary provision quoted above, therefore, the court awarded the residue of the estate to decedent's Philadelphia friend. This appeal from that determination is taken by testator's primary beneficiaries in Rumania.

Appellants contend that the Act did not prevent or prohibit distribution to the Rumanian legatees and that the court erroneously ruled that the Act operated to defeat the primary gifts under the will.

The litigants agree with the court's statement: "Decedent's intent is clear. If his estate were not able to be distributed to the Rumanian legatees under the law as it existed at the time of his death, distribution was

---

[1] Testator's will directed that if any of the five beneficiaries predeceased him, their shares should be distributed equally among such of the beneficiaries as survived him.

[2] Act of July 28, 1953, P. L. 674, 20 P.S. §§1155-1159 (Supp. 1964). See also Act of April 18, 1949, P. L. 512, §737, added by Act of February 23, 1956, P. L. (1955) 1084, §6, 20 P.S. §320.737 (Supp. 1964).

to be made to the alternate legatee." It is apparent that testator's primary concern was for his Rumanian relatives and friend and that his gift to the alternate residuary legatee in Philadelphia was intended to take effect only if there was no possibility at the time of his death that the Rumanian beneficiaries would ever receive the benefit and enjoyment of his gift. The sole and controlling question on this appeal, therefore, is whether the Act of 1953 prohibits or prevents distribution of this testamentary bequest to the Rumanian beneficiaries.

Section 2 of the "Iron Curtain Act"[3] provides: "Whenever it shall appear to the court that if distribution were made a beneficiary would not have the actual benefit, use, enjoyment or control of the money or other property distributed to him by a fiduciary, the court shall have the power and authority to direct the fiduciary (a) to make payment of the share of such beneficiary at such times and in such manner and amounts as the court may deem proper, or (b) to withhold distribution of the share of such beneficiary, convert it to cash, and pay it through the Department of Revenue into the State Treasury without escheat."

We find nothing in the statutory language of the Act or its objectives which expressly or impliedly prevents or prohibits distribution of a decedent's estate to a beneficiary not a resident of the United States. The Act contains no prohibitory words or mandate against distribution to such beneficiaries. Foreign-residing beneficiaries are not made ineligible to "take" testamentary bequests, nor does the Act bar or preclude such gifts to them.

---

[3] Act of July 28, 1953, P. L. 674, §2, 20 P.S. §1156 (Supp. 1964). It is to be noted that although the Act is popularly known as the "Iron Curtain Act", it applies to "any legatee, devisee, distributee or other person . . . who is not a resident of the United States, its territories or possessions." Act of July 28, 1953, P. L. 674, §1, 20 P.S. §1155 (Supp. 1964).

If the statute was designed to keep testamentary gifts from being awarded or distributed to foreign residents, the statutory command would have been expressed in imperative and prohibitory language rather than in permissive and protective terms.

The Act does not establish a proscriptive rule outlawing distribution to foreign legatees. Instead, it authorizes the court, on an ad hoc basis, to determine the time and manner of distribution[4] or, in the alterna-

---

[4] The provisions of the "Iron Curtain Act" sanction a transfer of funds, creating thereby a situation analogous to the relationship between a guardian and his ward. Rather than prohibitory, the Act is protective, having concern always for the best interests of the legatee.

It should be noted that the arrangements which may be set up for a legatee's benefit under the Act are quite flexible, allowing the court to design a procedure of distribution and actual transfer of assets to fit the circumstances of each particular case presented to it.

In addition to awarding the distributive share to the Commonwealth to be held in custodia legis until the legatee can prove that he will have the actual benefit, use, enjoyment or control of the money, courts may also distribute the legatee's share in small amounts over a period of time.

In *Dopierala Estate*, 40 Erie Co. L.J. 163, 7 Fiduc. Rep. 262 (Orphans' Ct. 1957), a trustee was appointed for the foreign beneficiary and authorized to withdraw not more than $50 every 60 days for the purchase of packages of necessities to be sent to the beneficiary, such practice to continue so long as the beneficiary acknowledged receipt of the packages and requested that they continue to be sent.

In *Zubko Estate*, 73 Montg. Co. L. Rep. 341, 12 Pa. D. & C. 2d 557 (Orphans' Ct. 1957), President Judge TAXIS followed the procedure adopted in *Dopierala* and appointed a trustee for the distributive shares of the foreign beneficiaries, permitting the trustee to withdraw up to $75 in each 60 day period for the purchase of parcels of necessities to be sent to the beneficiary.

In *Sutkowski Estate*, 10 Fiduc. Rep. 498, 20 Pa. D. & C. 2d 738 (Orphans' Ct. Phila. 1960), the court found that the Polish beneficiary would receive the possession, use, benefit and control of his legacy and made an award to him. The court noted, however,

tive, to direct a protective, custodial, interest-bearing deposit until the money can safely and feasibly be placed in the beneficiary's hands.[5] See *Bokey Estate,* 412 Pa. 244, 194 A. 2d 194 (1963).

In *Belemecich Estate,* 411 Pa. 506, 192 A. 2d 740 (1963),[6] this Court emphasized the precautionary and safekeeping objectives of the Act. We said its purpose was: ". . . to protect the moneys, physically in America, but belonging to people who fatefully find themselves behind the Iron Curtain of Communism. It is a commendable and salutary piece of legislation because it provides for the safekeeping of these funds even with accruing interest . . . ." 411 Pa. at 508, 192 A. 2d at 741.

We conclude, therefore, that the "Iron Curtain Act" did not prevent or prohibit distribution of decedent's residuary estate to his Rumanian legatees and that decedent's primary gifts to them are undefeated, valid and operative under the terms of the will.[7]

---

that: "The amount is less than $1,000. If it exceeded that amount, not more than $100 should be initially remitted and the personal representative would have the responsibility of making periodical distribution, having first produced evidence of the actual receipt of each preceding payment."

[5] Section 4 of the Act provides that when a beneficiary for whose benefit money is being held in the State Treasury can prove to the satisfaction of the court that he will have "the actual possession, benefit, use, enjoyment or control" thereof, the court shall direct payment to him of that money with interest at 2% per annum from the date the money was paid into the Treasury. Act of July 28, 1953, P. L. 674, §4, 20 P.S. §1158 (Supp. 1964).

[6] The case was reversed by the Supreme Court of the United States, 375 U.S. 395, 84 S. Ct. 452 (1964) on the ground that the Treaty of 1881 between the United States and Serbia (now part of Yugoslavia) compelled payment of the money. This Court's interpretation of the nature and purpose of our Act is not affected by the decision regarding the effect of the 1881 Treaty.

[7] Appellee urges that the appeal should be dismissed "because of laches." The inaction complained of is directed to appellants' delay in seeking review of the initial determination in the court

The decree is reversed and the matter is remanded to the court below with directions to enter an appropriate decree awarding the residuary estate to the primary beneficiaries in accordance with testator's will and to direct distribution under the provisions of the Act of July 28, 1953.

Decree reversed. Costs to be paid by the estate.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I disagree with the conclusion reached by the majority. It arrives at its conclusion by ignoring or misinterpreting the language of Wanson's will. Wanson did not make an absolute and unconditional gift of the remainder of his estate to his "Romanian" relatives and friend—his gift to them was conditional and if that condition could not be fulfilled, the testator made a gift over of this remainder to Marion Hampel. The laws of Rumania *prevented, at the time of his death, distribution* of the estate to the Rumanian legatees, i.e., prevented them from having at that time the actual benefit, use, enjoyment and control of the property bequeathed to them. Unlike the absolute legacy in *Belemecich Estate,* 411 Pa. 506, 192 A. 2d 740, which the majority rely on, the remainder "did not belong" to the (primary) legatees who were behind the Iron Curtain—it was, I repeat, a conditional gift with a clear and express gift over if the condition was not fulfilled.

I would affirm the Decree of the Court below.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

I find myself in disagreement with both the lower court and the majority of our Court.

---

below. However, appellee concedes on the record that appellants were not given proper notice of the filing of the account. The court below granted the petition for review because of the absence of notice. We find no reason to disturb or reverse the exercise of the hearing court's discretion in granting review.

I differ with the lower court because of its cavalier manner of disposing of appellants' contention that the clear import of testator's language is that only Federal or Rumanian laws are included.

Paragraph "No. 3" of the will provides: ". . . if at the time of my death the Laws of the United States of America, or the Laws of Romania prevent or prohibit the distribution of my Estate to the above-named Citizens of Romania, then . . . I . . . devise . . . the aforementioned remainder . . . to my friend, Marion Hampel. . . ." This is a gift over on the condition precedent that the *Laws of the United States of America* or *Rumania* prevented or prohibited distribution at the time of the testator's death. The phrase "Laws of the United States of America" is a recognized term referring only to Federal law. Its use in juxtaposition with references to the laws of another national entity precludes any interpretation of reference to the laws of any state. The will was apparently written by one learned in the law and cognizant of the Federal-State dichotomy of our legal system and we should not brush aside that distinction.

Therefore, if any Federal law or Rumanian law prevented distribution in 1957, at testator's death, then the condition occurred and the gift over was effective. If, however, no such Federal or Rumanian law then prevented distribution, and since testator made no reference to the laws of this Commonwealth or of any of the states, distribution should be made as if paragraph No. 3 had been omitted from the will. That is, if the only prevention of distribution at the time of testator's death was the "Iron Curtain Acts" of this Commonwealth, then the estate should have been administered as if the sole gift of the residue was to the five named Rumanian legatees.

The lower court failing to so read the will did not determine whether any Federal or Rumanian law pre-

vented distribution. I would, therefore, remand for adjudication on this point.

The majority followed the court below and failed to distinguish between what testator said and did not say in regard to which law was applicable, and further also failed to give due credence to the testator's clearly stated intent regarding the time of the operation of the condition.

Assuming, arguendo, that the majority is correct in adopting the lower court's interpretation as to which law is applicable, the majority has failed to see that testator intended that if the actual use and enjoyment of the gift could not be had at the time of his death, then the taker in default should benefit.

The clear language of the will so indicates. The words ". . . if at the time of my death . . ." are meaningless unless they are read to state that the gift over is effective if at that point in time distribution is prevented.

I dissent.